STANDARD CHEMICALS AND METALS' CORPORATION, Appellant, *v.* WAUGH CHEMICAL CORPORATION, Respondent.

Contract — sale of goods at fixed price — Lever Act void and illegality cannot result from failure to obey it — promulgation by president of order fixing prices did not save statute — order not applicable to pre-existing contracts.

1. The United States Supreme Court has held the prohibition of the Lever Act (40 U. S. Stat. at Large, 276) a nullity because too vague to be intelligible. The consequences of its decision are not limited to criminal prosecution but apply to civil suits as well. In an action to recover for breach of contract, in that defendant refused to receive certain goods sold to it at a fixed price, defended on the ground that after the contract was made the president of the United States, under the authority of the Lever Act, fixed the maximum price of such goods at a figure less than that of the contract, and so made the performance of the contract illegal and relieved the defendant from the duty of performance, it must be held that the prohibition of the Lever Act was void and that illegality could not result from the failure to obey it. (*United States* v. *Cohen Grocery Co.*, 255 U. S. 81; *Weeds* v. *United States*, 255 U. S. 109, followed.)

2. The promulgation by the president of an order fixing prices did not save the statute which it was intended to effectuate. The provision " to make such regulations and issue such orders as are essential effectively to carry out the provisions of this act " cannot be read as a delegation of authority to fix the prices for all articles which the statute classifies as necessaries. Congress prohibited inequitable and unreasonable conduct, but there is no evidence that in so doing it made the president its delegate to design and standardize the patterns of equity and reason.

3. Even assuming that the order validates the statute and in turn is validated by it, it cannot be construed as applying to pre-existing contracts.

*Standard C. & M. Corp.* v. *Waugh Chemical Corp.*, 194 App. Div. 254, reversed.

(Submitted March 1, 1921; decided April 19, 1921.)

APPEAL, by permission, from an order of the Appellate Division of the Supreme Court in the first judicial depart-

ment, entered December 3, 1920, which affirmed an order of Special Term overruling a demurrer to a defense in the answer.

The following question was certified: " Is the defense contained in the defendant's second amended answer herein insufficient in law upon the face thereof? "

*Abraham Benedict* and *Harold Kohn* for appellant. The defense is insufficient in law upon the face thereof. The courts below misconstrued the statute and the contract. (*Crown Embroidery Works* v. *Gordon*, 190 App. Div. 472; *Douglas* v. *Coonley*, 156 N. Y. 521; *U. S.* v. *Fuld Store Co.*, 262 Fed. Rep. 836; *U. S.* v. *Am. Woolen Co.*, 265 Fed. Rep. 404; *West Virginia Tr. & El. Co.* v. *Elm Grove Mining Co.*, 253 Fed. Rep. 772; *Lysle Milling Co.* v. *Sharp*, 207 S. W. Rep. 72; *Majestic Coal Co., Inc.*, v. *W. J. Bush & Co.*, 171 N. Y. Supp. 662; *Carlisle* v. *Lovell*, 171 N. Y. Supp. 996; *Matter of Quinby* v. *P. S. Comm.*, 223 N. Y. 244; *People ex rel. N. Y. Rys. Co.* v. *P. S. Comm.*, 223 N. Y. 373.) The president had no authority to fix prices. (*Little* v. *Barreme*, 2 Cranch, 170; *Milligan* v. *Hovey*, 3 Biss. 13; *Hendricks* v. *Gonzales*, 67 Fed. Rep. 351; *Mawhinney* v. *Millbrook Woolen Mills, Inc.*, 105 Misc. Rep. 99, 105; 188 App. Div. 971; *Weed & Co.* v. *Lockwood*, 266 Fed. Rep. 785; *United States* v. *Bernstein*, 267 Fed. Rep. 295.)

*Joseph H. Kutner* for respondent. The defense is sufficient and the demurrer was properly overruled. (*Boret* v. *Vogelstein & Co., Inc.*, 188 App. Div. 605; 230 N. Y. 45; *Crown Embroidery Works* v. *Gordon*, 190 App. Div. 472.) The president had authority to fix prices. (*Kruger G. & B. Co.* v. *R. C. P. Assn.*, 250 Fed. Rep. 890; *West Virginia Traction Co.* v. *Elm Grove Mining Co.*, 253 Fed. Rep. 272; *United States* v. *Mossew*, 261 Fed. Rep. 999; *Matter of Food Conservation Act*, 259 Fed. Rep. 894; *United States* v. *Rosenblum*, 264 Fed.

Rep. 578; *United States* v. *Spokane Dry Goods Co.*, 264 Fed. Rep. 845; *Weed* v. *Lockwood*, 266 Fed. Rep. 785; *United States* v. *Penn Central Coal Co.*, 256 Fed. Rep. 703.)

CARDOZO, J.  By contract dated September 28, 1917, the plaintiff agreed to sell and the defendant to buy 1,600 tons of oleum at $45 per ton, deliveries to be made at the rate of 200 tons monthly, beginning November, 1917, and ending June, 1918, upon shipping instructions to be supplied by the defendant.  A modification of the contract in November, 1917, gave the defendant the privilege of reducing the monthly installments, and thus extending the time for payment, but a reasonable time after June, 1918, was to be the limit of postponement.

In September, 1918, 1,189.2 tons had been accepted and paid for in accordance with the contract as thus modified.  The defendant refused to give shipping instructions for the delivery of the residue (410.8 tons).  The refusal, it is urged, is justified by the provisions of the Lever Act (Act of Congress of August 10, 1917, ch. 53, sec. 4; 40 Stat. 276; U. S. Compiled Statutes, 1919 Supplement, vol. 1, p. 660, sec. 3115 1/8ff) under which it is declared unlawful " to engage in any discriminatory and unfair, or any deceptive or wasteful practice or device, or to make any unjust or unreasonable rate or charge, in handling or dealing in or with any necessaries; " or " to conspire, combine, agree, or arrange with any other person, * * * to exact excessive prices for any necessaries."  The President by another section (sec. 1; Comp. Statutes, sec. 3115 1/8e) " is authorized to make such regulations and to issue such orders as are essential effectively to carry out the provisions of this act."  No claim is put forward that the price to be paid by the defendant was unjust, unreasonable or excessive at the making of the contract.  No claim is put forward that it became unjust or unreasonable afterwards.  All that is claimed is that it became excessive *ipso facto* by force of

executive pronouncement. The answer states that on June 27, 1918, the President of the United States fixed the maximum price of oleum at $32 per ton, and thereafter on September 30, 1918, at $28 per ton. The result, we are told, was to make the performance of the contract illegal, and to relieve the defendant from the duty of performance.

I am unable for more than one reason to assent to that conclusion.

(1) I feel constrained to hold, in adherence to the ruling of the Supreme Court of the United States in *U. S.* v. *L. Cohen Grocery Co.* (decided February 28, 1921, 255 U. S. 81; 41 S. C. Rep. 298) and *Weeds* v. *U. S.* (255 U. S. 109; 41 S. C. Rep. 306), that the prohibition of the Lever Act is void, and that illegality cannot result from the failure to obey it. I do not overlook the fact that the court was there dealing with a criminal prosecution. The ground on which it placed its judgment applies, and with like consequences, to civil suits as well. The prohibition was declared a nullity because too vague to be *intelligible*. No standard of duty had been established. No test had been supplied, as where statutes direct adherence to reasonable or market values (*Int. Harv. Co.* v. *Ky.*, 234 U. S. 216, 221; *Collins* v. *Ky.*, 234 U. S. 634, 638), or to rates fixed by a commission or other legislative agencies. There was merely the denunciation of " acts detrimental to the public interest when unjust and unreasonable in the estimation of the court and jury " (*U. S.* v. *L. Cohen Grocery Co.*, *supra*). The variant views of judges of the District Courts were quoted as evidence of the absence of a standard. If this is the rationale of the decision, its consequences are not limited to criminal prosecutions. A prohibition so indefinite as to be unintelligible is not a prohibition by which conduct can be governed. It is not a rule at all; it is merely exhortation and entreaty. The act, as the Supreme Court construes it, rejects all objective standards, all determinate

or determinable criteria, the tests of practice or precedent
or the market or the vicinage.  Rejecting these, it sets
the individual adrift upon the uncharted sea of sub-
jective prejudice and favor.  The *arbitrium boni viri*,
unrestrained and undirected, becomes the test of right
and wrong.  I do not say that the lawmaking body is
incompetent, in time of war, to compel the trader to
accept such prices for his commodities as juries may
consider fair.  That question is not here.  I am concerned
now with the question whether there is an offense against
the public order, bringing down upon his contracts, as
a consequence, the penalty of illegality and forfeiture if
he fails to adjust behavior to ideals of equity and wisdom
as varied as the minds of men.  Offending contracts
are not merely modified, their exactions scaled down to
conform to the finding of right reason as declared by
court or jury after the event.  They are wiped out
altogether, their exactions adjudged illegal, their makers
viewed as malefactors, for failure to conform to the
unknown and unknowable.  I do not attempt to consider
whether the act might have been so restricted or inter-
preted as to save its validity either wholly or in part.
Since the decision of the Supreme Court, the fact of
indefiniteness is no longer open to inquiry.  The lack
of any standard, either expressly established, or ascertain-
able with approximate certainty from sources *aliunde*,
is to be accepted as a datum.  Disobedience is impossible
unless there is something to be obeyed.

We are told that the statute, if unintelligible and
uncertain in its inception, gained meaning and certainty
and with those qualities validity upon the promulgation
by the President of an order fixing prices.  I put aside
the question whether the order, rightly construed, did
prescribe a maximum beyond which charges were to be
prohibited.  Even if it did, it did not save the statute
which it was intended to effectuate.  We are not dealing
here with an authority such as may be found in section

25, under which the President is expressly empowered to fix the price of coal and coke, with the aid of elaborate tests and safeguards for the protection of producers. They are to be allowed the cost of production, the expense of operation, maintenance, depreciation and depletion, and in addition thereto a just and reasonable profit (section 25). We are dealing here with an authority declared in general terms " to make such regulations and issue such orders as are essential effectively to carry out the provisions of this act."

I cannot read that provision as a delegation of authority to fix the prices for all articles which the statute classifies as necessaries. It is a part, not of section 4 which prohibits unreasonable practices and charges, but of section 1, which is in the nature of a preamble, stating the aim of the statute and the general scope of the provisions. If Congress had meant to confer upon the President authority to fix prices generally, I think it would have used language as plain and simple as it did in section 25 in respect of coal and coke, and not left a power so vital to be deduced by doubtful inference. *Expressio unius est exclusio alterius.* (Cf. sections 14 and 15 dealing with prices of wheat.) Two members of the Supreme Court (Pitney and Brandeis, JJ.) thought that the prohibition of the statute had no relation in any circumstances (except in cases of conspiracy) to prices upon sales. They were unable to bring " prices " within the description of rates or charges " in handling in or dealing with " the necessaries of life (*Weeds* v. *U. S.; U. S.* v. *L. Cohen Grocery Co., supra*). The other members of the court did not pass upon that question, but put their votes on other grounds. We are now asked to go still farther. By words of doubtful application, we are first to read into the statute an intent to govern prices, and then to read into it the intent that the prices thus governed shall be fixed by proclamation of the President. To do that is to pile one doubt upon another till all that

is certain in the conclusion is the assurance of uncertainty. There remains an ample field for executive discretion without this straining of unwilling words. We have only to run our eyes hastily over other sections of the statute to find occasions, and many of them, where regulations and orders, not involving the creation of a price list, are recognized as needful. It is there that the power to regulate finds a fitting field of exercise. We are not to enlarge the executive prerogative to cover subjects and occasions not fairly within the range of delegation. Congress prohibited conduct that is inequitable and unreasonable. I see no evidence that in so doing it made the President its delegate to design and standardize the patterns of equity and reason.

The difficulty, thus analyzed, is seen to be fundamental and inherent. If power to fix prices is to be deduced from the power to effectuate, its exercise presupposes knowledge of the thing to be effectuated. If the President is to promote a purpose and realize a meaning, he must know the purpose to be promoted, the meaning to be realized. The Supreme Court has said that the purpose of this statute is undisclosed and the meaning unintelligible. The President (under section 1) is to put into execution the will of the legislative body. He cannot put it into execution unless it has been revealed. If Congress does not tell him what it wishes to condemn, he does not cure the defect by a decree of condemnation. The will that he effectuates in such circumstances is not that of Congress, but his own. I do not need to consider how far it is permissible for Congress to delegate its discretion either to the President or to others (*U. S.* v. *Grimaud*, 220 U. S. 506, 517; *Light* v. *U. S.*, 220 U. S. 523; *Buttfield* v. *Stranahan*, 192 U. S. 470, 486). By no fair construction of the statute is that what it assumed to do. The act presupposes a legislative meaning and purpose which, at least in plan and outline, have been adequately declared. It delegates not the power to initiate, but the

power to put into effect. If courts and juries cannot say what kinds of practices and charges were intended to be hit by the prohibition of the unjust and the unreasonable in conduct or in trade, I can see no other sources of information that were open to the President. He has not been authorized to fix his own standard. He has been authorized to give effect by regulation and order to the standard in the mind of Congress. The unknowable must remain unknown, even to chiefs of states.

(2) If, however, we assume that the order validates the statute, and in turn is validated by it, I am unable to construe it as applying to pre-existing contracts. There is a presumption that statutes, not affecting remedies, are directed to the future (*Winfree* v. *No. Pac. R. Co.*, 227 U. S. 296; *Jacobus* v. *Colgate*, 217 N. Y. 235; *Isola* v. *Weber*, 147 N. Y. 329). The presumption must apply, at least with equal force, to orders of the President. Orders fixing the price of coal and coke do not invalidate contracts already made, for the statute so provides (section 25). Orders fixing other prices must be construed as subject to like restrictions unless the form of the order or the good sense of the transaction suggests another meaning.

If the form of these orders is considered, there is no hint of retroactive purpose. All that they show is that in June and September, 1918, the war industries board announced that at a meeting of the manufacturers of sulphuric and nitric acid with the price-fixing committee of the board a stated schedule of maximum prices had been agreed upon and approved by the President. If this can be said to be an order at all, and not merely an agreement binding upon the parties to the conference, there is surely no suggestion that by the mere approval of this agreement the President manifested an intent to put the stamp of illegality upon the performance of existing contracts. Something more would naturally have been said, if such a purpose were in view.

When we pass from the form of the order to the

surrounding circumstances, the conclusion is not altered. Nine months before the President's order of June, 1918, a contract calling for future deliveries and payments was made on just and equitable terms. If the defendant had not asked for and obtained the privilege of an extension, performance would have been substantially completed before a maximum price was named. We are now asked to say that the extension may be used as an excuse for avoiding performance altogether. I can see no justification for the belief that the President, in approving the manufacturers' agreement, had such deliveries in mind. The plaintiff, in order to fill this contract, had to supply itself with the necessary quantity of the commodity to be delivered. Its price was fixed, presumably, in view of that necessity and of the conditions of the market. Nearly a year later it is told that the effect of an order of the President is not merely to establish a price that must be adhered to in the future, but to wipe out its contract altogether, however moderate the profit, and throw back upon its hands the merchandise that was to fill the order. If such consequences were intended, the intent is not disclosed.

The order of the Appellate Division and that of the Special Term should be reversed, with costs in all courts, the demurrer sustained, and the question certified answered in the affirmative.

HISCOCK, Ch. J., CRANE and ANDREWS, JJ., concur; POUND, J., concurs on second ground stated in opinion; McLAUGHLIN, J., concurs on first ground stated in opinion; CHASE, J., dissents.

Orders reversed, etc.