[Civ. No. 8455.   Second Appellate District, Division Two.—January 27, 1933.]

SOLVADOR ROLDAN, Respondent, v. LOS ANGELES COUNTY et al., Appellants.

Everett W. Mattoon, County Counsel, and S. V. O. Prichard, Deputy County Counsel, for Appellants.

U. S. Webb, Attorney-General, and Frank English, Deputy Attorney-General, as *Amici Curiae* on Behalf of Appellants.

Gladys Towles Root and George B. Bush for Respondent.

ARCHBALD, · J., *pro tem.*—Solvador Roldan applied to the county clerk of Los Angeles County for a license to wed a woman of Caucasian descent and was refused such license. On a hearing of his application before the superior court for a writ to compel the issuance thereof he was found to be a "Filipino", viz., "an Illocano, born in the Philippine Islands of Filipino progenitors in whose blood was co-mingled a strain of Spanish", and not a Mongolian. From a judgment making the alternative writ of mandate permanent the defendants have appealed.

█ Section 69 of the Civil Code, relating to marriage licenses, was amended in 1880 (Code Amendments, 1880, p. 3) to prohibit the issuance of a license authorizing the marriage of a white person "with a . . . Mongolian". Section 60 of the Civil Code was amended in 1905 (Stats. 1905, p. 554) by adding "Mongolians" to the classes whose marriage with a "white" was made "illegal and void". The sole question involved in this appeal is whether or not the legislature in 1880 and 1905 meant to include Filipinos in its use of the word "Mongolian".

We find no dissent to the statement that the Filipino is included among the Malays, although since the time of Huxley, at least, there has been some question among ethnologists as to whether the five grand subdivisions of the races of mankind, as classified by Blumenbach, is the proper classification or whether the Malays are to be included among the "Mongoloid" group and as a branch of the Mongolian family. We are not, however, interested in what the best scientific thought of the day was, but in what was the common use of the word "Mongolian" in California at the time of the enactment of the legislation above mentioned.

The case of *Ah Yup,* Fed. Cas. No. 104, decided by Judge Sawyer of the United States Circuit Court, District of California, in 1878, contains this information: "In speaking of the various classifications of races, Webster in his dictionary says [italics ours] : 'The *common* classification is that of Blumenbach, who makes five: (1) the Caucasian, or white race, . . . (2) the Mongolian, or yellow race, occupying Tartary, China, Japan, etc., (3) the Ethiopian or negro (black) race, . . . (4) the American, or red race, . . . and (5) the Malay, or brown race, occupying the Indian Archi-

pelago'." The 1891 edition of Webster's comprising the earlier editions of 1864, 1879 and 1884, under the heading "Race", says: "Naturalists and ethnographers divide mankind into several distinct varieties, or races . . . One of the common classifications is that of Blumenbach, who makes five races," describing them the same as the quotation of Judge Sawyer from the earlier Webster's and adding that "many recent writers classify the Malay and American races as branches of the Mongolian". Practically the same wording is found in the 1903 edition of Webster's.

The Standard Dictionary of 1911 gives the following definition of a Mongolian: "(1) A Mongol. (2) By extension a Chinaman: In Blumenbach's system any one of the yellow peoples of China."

The New American Cyclopaedia (1863) defines "Mongolian Race" as "one of the great ethnological divisions of mankind", and the article thereon continues: "Dr. Pickering, in 'The Races of Men', includes the American Indians among the Mongolians . . . By most writers, however, the American Indians are held to be a distinct race, and the term Mongolian is restricted chiefly to the following nations: the Mongols proper, the Mantchoos, Coreans, Chinese, Thibetans, Anamites, Burmese, Siamese, Japanese, Samoyeds, Koriaks, Ourals, Ostiaks, Kamchatdales, Finns, Laplanders, Esquimaux and the various tribes inhabiting Toorkistan or Independent Tartary, who are commonly called Tartars by Europeans."

Ogilvie's Imperial Dictionary of the English Language (1884), under "Mongol, Mongolian", says: "An epithet sometimes employed to the whole class of Turanian tongues, sometimes restricted to that group spoken by the Kalmucks and other tribes from Thibet to China.—Mongolian race, the second in Blumenbach's classification of the races of mankind. It corresponded very closely with the modern Turanian division." This dictionary also defines "Malay" as "belonging or relating to the Malays or to their country.—Malay race, one of the five principal divisions of mankind according to Blumenbach."

In the "Reports of the Immigration Commission" of the United States (1911), vol. 5, "Dictionary of Races or Peoples", p. 94, under "Malay, Malaysian or Brown Race", appears the following, the italics being ours: "One of the

five grand divisions of mankind as *commonly* classified since the time of Blumenbach, but the most disputable one in the view of recent ethnologists. Many consider it to be a branch of the Mongolian race, but such admit, at least, that it is the most divergent great branch of the latter.'' And on page 97 of the same volume, under ''Mongolian, etc.'', we read: ''Many ethnologists so define 'Mongolian' as to include the entire American and Malay races.''

We think we have quoted enough to show that, regardless of the fine points of the argument from the ethnologist's standpoint, the early classification of Blumenbach left its impression on the writers from his day to 1905, at least, so that his classification is spoken of as the one ''commonly'' used; and we venture to think that in the recollection of those whose early schooling was anywhere in the period from 1850 to 1905 his classification of the races into the five divisions, the white, black, yellow, red and brown, still persists.

From 1862 to 1885 the history of California is replete with legislation to curb the so-called ''Chinese invasion'', and as we read we are impressed with the fact that the terms ''Asiatics'', ''Coolies'' and ''Mongolians'' meant ''Chinese'' to the people who discussed and legislated on the problem, or at most that they only extended in their thought to natives of China and the inhabitants of adjacent countries having the same characteristics. It appears from the report in 1878 to the state senate of its ''Special Committee on Chinese Immigration'' that the mass of the immigration complained of came from the ''port of Hong Kong'' (p. 64), and that of the Chinese then here ''you would not find one in a thousand—probably one in five thousand—but that came from Kwang-Tung, the province of which Canton is capital'' (p. 70). In the same volume (p. 265) is an article by H. W. Clement, a member of the San Francisco bar, entitled ''Caucasian vs. Mongolian'', in which he speaks of the Americans as the sons of Japheth in possession of America; that ''seized with an insane desire to revisit the old homestead'', and finding it surrounded by the ''Chinese Wall'', they battered it down, ''but from out the breach swarmed one hundred fifty thousand of the three hundred millions of overcrowded humanity within, who threaten to overrun us. . . . We find by our twenty-five

years of acquaintance with them . . . that the . . . change-less life of 'Shem' and his descendants from Asia has shaped their character . . . and determined their race, and we call them Mongolians. . . . The conflicting rights, preju-dices and interests of those two races in California con-stitutes the Chinese problem."

In the "Debates and Proceedings of the Constitutional Convention of the State of California" (1878–79), speaking on the report of the "Committee on Chinese" relative to articles proposed affecting those nationals, Mr. John F. Miller says: "They [certain church people opposing re-strictions] would Mongolize this land in a vain attempt to bring the Chinese to a knowledge . . . " (vol. 1, p. 633). Mr. Charles C. O'Donnell (p. 647): "If you expect to wipe out crime you must wipe out the presence of the Mongolian in our midst." We could quote an infinite num-ber of similar statements, all of which point to the fact that the speakers were using the term "Mongolian" in the sense of the problem that they were discussing, viz., the Chinese problem, and that it only applied to that people, including possibly the inhabitants of contiguous countries of the same characteristics. Mr. Burt, not liking the desig-nations "Mongolian race" and "persons not eligible to become citizens", in some of the proposed articles, said (p. 652): "We mean Chinese, and why not come out squarely and say so." The report of the committee, in-stead of using the words "Chinese or Mongolian" now ap-pearing in section 2, article XIX of the Constitution, used the words "foreigners who are not eligible for citizenship", and Mr. N. G. Wyatt, a member from Monterey County, moved to amend the section by inserting in place of such words the words "Chinese or Mongolian", because of the uncertainty of the original language. Some courts ap-parently having admitted Chinese to citizenship while some denied them that privilege, Mr. Wyatt said (vol. 2, p. 681): "I want it amended so as to apply, *eo nomine*; to the class it is intended to affect." Mr. Barnes made a similar objection to the language used by the committee, saying (p. 687): "If we mean Chinamen, why not say Chinamen or Mongolian?"

Mr. John S. Hager, who moved to amend section 5 of the proposed article by prohibiting any resident or foreigner

ineligible to citizenship from owning property in the state after 1880, said (vol. 3, p. 1429): "That applies to all classes of foreigners who are ineligible to become citizens. It also gives them sufficient notice." Mr. C. V. Stuart then inquired: "Will that apply to any but Chinese in fact?" Mr. Hager replied: "I think there are some others." The lone voice in the convention that objected to the use of the word "Mongolian" was that of James J. Ayers, who said (vol. 2, p. 717): "The term Mongolian does not apply exclusively to the Chinese. It is a generic type of the human family, and some of the leading authorities on ethnology have divided the species into three classes: Mongolian, Caucasian and Negro. Some of them claim that the word Mongol embraces the American Indian." He then added: "We all know that we mean Chinamen, and why not say Chinamen?" That the Malay race was not in the thoughts of any in the convention as being included in the designations used is clearly shown from the speech of Mr. James M. Shafter against the proposed amendment prohibiting the employment of Chinese by public officers and making a candidate for office ineligible who employed or had employed them within three months previously. After stating that such provision was the equivalent to debarring Chinese from employment (vol. 2, p. 676), he declared: "I have had in my employment natives of most European countries, of the isles of the sea, including the Cannibal Islands of the south Pacific. Why do you not exclude the Kanakas, the Fiji, the Malay or the criminal from Australia? No reason against the Chinaman but presses with greater force against these people." Apparently no one challenged this statement, which implied that the Malay, at least, was not included in the designation "Mongolian"; and we can draw but one conclusion from the debates, and that is that such an idea was not present in the minds of the members of the convention.

Much more could be shown but we think we have set down sufficient to indicate that in 1880, in a group that would compare very favorably with the average legislature, there was no thought of applying the name Mongolian to a Malay; that the word was used to designate the class of residents whose presence caused the problem at which all the legislation was directed, viz., the Chinese, and possibly

contiguous peoples of like characteristics; that the *common* classification of the races was Blumenbach's, which made the "Malay" one of the five grand subdivisions, i. e., the "brown race", and that such classification persisted until after section 60 of the Civil Code was amended in 1905 to make it consistent with section 69 of the same code. As counsel for appellants have well pointed out, this is not a social question before us, as that was decided by the legislature at the time the code was amended; and if the common thought of to-day is different from what it was at such time, the matter is one that addresses itself to the legislature and not to the courts.

Judgment affirmed.

Works, P. J., and Craig, J., concurred.

A petition by appellants to have the cause heard in the Supreme Court, after judgment in the District Court of Appeal, was denied by the Supreme Court on March 27, 1933.

Seawell, J., Preston, J., and Thompson, J., dissented.