[L. A. No. 20305.   In Bank.   Oct. 1, 1948.]

ANDREA D. PEREZ et al., Petitioners, v. W. G. SHARP,
as County Clerk, etc., Respondent.

Daniel G. Marshall for Petitioners.

Harold W. Kennedy, County Counsel (Los Angeles), and Charles C. Stanley, Jr., Deputy County Counsel, for Respondent.

TRAYNOR, J.—In this proceeding in mandamus, petitioners seek to compel the County Clerk of Los Angeles County to issue them a certificate of registry (Civ. Code, § 69a) and a license to marry. (Civ. Code, § 69.) In the application for a license, petitioner Andrea Perez states that she is a white person and petitioner Sylvester Davis that he is a Negro. Respondent refuses to issue the certificate and license, invoking Civil Code, section 69, which provides: ". . . no license may be issued authorizing the marriage of a white person with a Negro, mulatto, Mongolian or member of the Malay race."

Civil Code, section 69, implements Civil Code, section 60, which provides: "All marriages of white persons with negroes, Mongolians, members of the Malay race, or mulattoes are illegal and void." This section originally appeared in the Civil Code in 1872, but at that time it prohibited marriages only between white persons and Negroes or mulattoes. It

succeeded a statute prohibiting such marriages and authorizing the imposition of certain criminal penalties upon persons contracting or solemnizing them. (Stats. 1850, ch. 140, p. 424.) Since 1872, Civil Code, section 60, has been twice amended, first to prohibit marriages between white persons and Mongolians (Stats. 1901, p. 335) and subsequently to prohibit marriages between white persons and members of the Malay race. (Stats. 1933, p. 561.)

Petitioners contend that the statutes in question are unconstitutional on the grounds that they prohibit the free exercise of their religion and deny to them the right to participate fully in the sacraments of that religion. They are members of the Roman Catholic Church. They maintain that since the church has no rule forbidding marriages between Negroes and Caucasians, they are entitled to receive the sacrament of matrimony.

The provision of the First Amendment to the Constitution of the United States that Congress shall make no law ''respecting an establishment of religion, or prohibiting the free exercise thereof'' is encompassed in the concept of liberty in the Fourteenth Amendment. State legislatures are therefore no more competent than Congress to enact such a law. (*Cantwell* v. *Connecticut*, 310 U.S. 296, 303 [60 S.Ct. 900, 84 L.Ed. 1213, 128 A.L.R. 1352].) They may, however, regulate conduct for the protection of society, and insofar as their regulations are directed towards a proper end and are not unreasonably discriminatory, they may indirectly affect religious activity without infringing the constitutional guarantee. Although freedom of conscience and the freedom to believe are absolute, the freedom to act is not. (*Cantwell* v. *Connecticut, supra,* at pp. 303-304.)

The regulation of marriage is considered a proper function of the state. It is well settled that a legislature may declare monogamy to be the ''law of social life under its dominion,'' even though such a law might inhibit the free exercise of certain religious practices. (*Reynolds* v. *United States*, 98 U.S. 145, 166 [25 L.Ed. 244] ; *Davis* v. *Beason*, 133 U.S. 333, 343 [10 S.Ct. 299, 33 L.Ed. 637].) If the miscegenation law under attack in the present proceeding is directed at a social evil and employs a reasonable means to prevent that evil, it is valid regardless of its incidental effect upon the conduct of particular religious groups. If, on the other hand, the law is discriminatory and irrational,

it unconstitutionally restricts not only religious liberty but the liberty to marry as well.

The due process clause of the Fourteenth Amendment protects an area of personal liberty not yet wholly delimited. "While this Court has not attempted to define with exactness the liberty thus guaranteed, the term has received much consideration and some of the included things have been definitely stated. Without doubt, it denotes not merely freedom from bodily restraint, but also the right of the individual to contract, to engage in any of the common occupations of life, to acquire useful knowledge, *to marry*, establish a home and bring up children, to worship God according to the dictates of his own conscience, and, generally, to enjoy those privileges long recognized at common law as essential to the orderly pursuit of happiness by free men." (Italics added; *Meyer* v. *Nebraska*, 262 U.S. 390, 399 [43 S.Ct. 625, 67 L.Ed. 1042].)

■ Marriage is thus something more than a civil contract subject to regulation by the state; it is a fundamental right of free men. There can be no prohibition of marriage except for an important social objective and by reasonable means.

No law within the broad areas of state interest may be unreasonably discriminatory or arbitrary. The state's interest in public education, for example, does not empower the Legislature to compel school children to receive instruction from public teachers only, for it would thereby take away the right of parents to "direct the upbringing and education of children under their control." (*Pierce* v. *Society of Sisters*, 268 U.S. 510, 534-535 [45 S.Ct. 571, 69 L.Ed. 1070, 39 A.L.R. 468].) Again, the state's vital concern in the prevention of crime and the mental health of its citizens does not empower the Legislature to deprive "individuals of a right which is basic to the perpetuation of a race—the right to have offspring" by authorizing the sterilization of criminals upon an arbitrary basis of classification and without a fair hearing. (*Skinner* v. *Oklahoma*, 316 U.S. 535, 536 [62 S.Ct. 1110, 86 L.Ed. 1655].)[1]

---

[1] See also the concurring opinion of Jackson, J., indicating that sterilization of criminals as a biological experiment might be invalid: "There are limits to the extent to which a legislatively represented majority may conduct biological experiments at the expense of the dignity and personality and natural powers of a minority—even those who have been guilty of what the majority define as crimes. But this Act falls down before reaching this problem, which I mention only to avoid the implication that such a question may not exist because not discussed. On it I would also reserve judgment." (316 U.S. 546-547; see 51 Yale L.J. 1380.)

The right to marry is as fundamental as the right to send one's child to a particular school or the right to have offspring. Indeed, "We are dealing here with legislation which involves one of the basic civil rights of man. Marriage and procreation are fundamental to the very existence and survival of the race." (*Skinner* v. *Oklahoma, supra,* at p. 541.) ▮ Legislation infringing such rights must be based upon more than prejudice and must be free from oppressive discrimination to comply with the constitutional requirements of due process and equal protection of the laws.

I

Since the right to marry is the right to join in marriage with the person of one's choice, a statute that prohibits an individual from marrying a member of a race other than his own restricts the scope of his choice and thereby restricts his right to marry. It must therefore be determined whether the state can restrict that right on the basis of race alone without violating the equal protection of the laws clause of the United States Constitution.

"Distinctions between citizens solely because of their ancestry are by their very nature odious to a free people whose institutions are founded upon the doctrine of equality. For that reason, legislative classification or discrimination based on race alone has often been held to be a denial of equal protection. *Yick Wo* v. *Hopkins,* 118 U.S. 356 [6 S.Ct. 1064, 30 L.Ed. 220] ; *Yu Cong Eng* v. *Trinidad,* 271 U.S. 500 [46 S.Ct. 619, 70 L.Ed. 1059] ; *Hill* v. *Texas,* 316 U.S. 400 [62 S.Ct. 1159, 86 L.Ed. 1559]." (*Hirabayashi* v. *United States,* 320 U.S. 81, 100 [63 S.Ct. 1375, 87 L.Ed. 1774].) In the Hirabayashi case the United States Supreme Court held that despite the fact that under the Constitution of the United States "racial discriminations are in most circumstances irrelevant and therefore prohibited, it by no means follows that, in dealing with the perils of war, Congress and the Executive are wholly precluded from taking into account those facts and circumstances which are relevant to measures for our national defense and for the successful prosecution of the war, and which may in fact place citizens of one ancestry in a different category from others. . . . The adoption by Government, in the crisis of war and of threatened invasion, of measures for the public safety, based upon the recognition of facts and circumstances which indicate that a group of one national ex-

traction may menace that safety more than others, is not wholly beyond the limits of the Constitution and is not to be condemned merely because in other and in most circumstances racial distinctions are irrelevant. . . . The fact alone that attack on our shores was threatened by Japan rather than another enemy power set these citizens apart from others who have no particular association with Japan.'' (320 U.S. 81, 100-101.) Whether or not a state could base similar measures on the peril caused by a national emergency in the face of the equal protection of the laws clause of the United States Constitution, which does not apply to the federal government, it clearly could not make such a distinction based on ancestry in the absence of an emergency.

▮ A state law prohibiting members of one race from marrying members of another race is not designed to meet a clear and present peril arising out of an emergency. In the absence of an emergency the state clearly cannot base a law impairing fundamental rights of individuals on general assumptions as to traits of racial groups. It has been said that a statute such as section 60 does not discriminate against any racial group, since it applies alike to all persons whether Caucasian, Negro, or members of any other race. (*In re Estate of Paquet,* 101 Ore. 393, 399 [200 P. 911].) The decisive question, however, is not whether different races, each considered as a group, are equally treated. ▮ The right to marry is the right of individuals, not of racial groups. The equal protection clause of the United States Constitution does not refer to rights of the Negro race, the Caucasian race, or any other race, but to the rights of individuals. (*State of Missouri ex rel. Gaines* v. *Canada,* 305 U.S. 337, 351 [59 S.Ct. 232, 83 L.Ed. 208]; *McCabe* v. *Atchison, Topeka & Santa Fe Ry. Co.,* 235 U.S. 151, 161-162 [35 S.Ct. 69, 59 L.Ed. 169].) In construing the equal protection of the laws clause of the Constitution, the United States Supreme Court has declared that the constitutionality of state action must be tested according to whether the rights of an individual are restricted because of his race. Thus, in holding invalid state enforcement of covenants restricting the occupation of real property on grounds of race, the Supreme Court of the United States declared: ''The rights created by the first section of the Fourteenth Amendment are, by its terms, guaranteed to the individual. It is, therefore, no answer to these petitioners to say that the courts may also be induced to deny white

persons rights of ownership and occupancy on grounds of race or color. Equal protection of the laws is not achieved through indiscriminate imposition of inequalities.'' (*Shelley v. Kraemer,* 334 U.S. 1 [68 S.Ct. 836, 846, 92 L.Ed. ——].) In an earlier case, where a Negro contended that the state's failure to give him equal facilities with others to study law within the state impaired his constitutional rights under the equal protection clause, the court rejected any consideration of the difference of the demand for legal education among white persons and Negroes, stating: ''Petitioner's right was a personal one. It was as an individual that he was entitled to the equal protection of the laws, and the State was bound to furnish him within its borders facilities for legal education substantially equal to those which the State there afforded for persons of the white race, whether or not other negroes sought the same opportunity.'' (*State of Missouri ex rel. Gaines v. Canada,* 305 U.S. 337, 351 [59 S.Ct. 232, 83 L.Ed. 208]; *Sipuel* v. *Board of Regents,* 332 U.S. 631 [68 S.Ct. 299, 92 L.Ed. ——].) Similarly, with regard to the furnishing of sleeping, dining, and chair car facilities on trains, the Supreme Court of the United States has held that even though there was less demand for such facilities among Negroes than among whites, the right of a member of the Negro race to substantially equal facilities was a right of the individual and not of the racial group: ''It is the individual who is entitled to equal protection of the laws, and if he is denied by a common carrier, acting in the matter under the authority of a state law, a facility or convenience in the course of his journey which, under substantially the same circumstances, is furnished to another traveler, he may properly complain that his constitutional privilege has been invaded.'' (*McCabe* v. *Atchison, Topeka & Santa Fe Railway Co.,* 235 U.S. 151, 161, 162 [35 S.Ct. 69, 59 L.Ed. 169].) In these cases the United States Supreme Court determined that the right of an individual to be treated without discrimination because of his race can be met by separate facilities affording substantially equal treatment to the members of the different races. A holding that such segregation does not impair the right of an individual to ride on trains or to enjoy a legal education is clearly inapplicable to the right of an individual to marry. Since the essence of the right to marry is freedom to join in marriage with the person of one's choice, a segregation statute for marriage necessarily impairs the right to marry.

In determining whether the public interest requires the prohibition of a marriage between two persons, the state may take into consideration matters of legitimate concern to the state. Thus, disease that might become a peril to the prospective spouse or to the offspring of the marriage could be made a disqualification for marriage. (See for example, Civ. Code, §§ 79.01, 79.06.)   Such legislation, however, must be based on tests of the individual, not on arbitrary classifications of groups or races, and must be administered without discrimination on the grounds of race. (*Yick Wo* v. *Hopkins,* 118 U.S. 356, 373 [6 S.Ct. 1064, 30 L.Ed. 220].) It has been suggested that certain races are more prone than the Caucasian to diseases such as tuberculosis. If the state determines that certain diseases would endanger a marital partner or offspring, it may prohibit persons so diseased from marrying, but the statute must apply to all persons regardless of race. Sections 60 and 69 are not motivated by a concern to diminish the transmission of disease by marriage, for they make race and not disease the disqualification. Thus, a tubercular Negro or a tubercular Caucasian may marry subject to the race limitation, but a Negro and a Caucasian who are free from disease may not marry each other. If the purpose of these sections was to prevent marriages by persons who do not have the qualifications for marriage that the state may properly prescribe, they would make the possession of such qualifications the test for members of all races alike. By restricting the individual's right to marry on the basis of race alone, they violate the equal protection of the laws clause of the United States Constitution.

## II

The parties, however, have argued at length the question whether the statute is arbitrary and unreasonable. They have assumed that under the equal protection clause the state may classify individuals according to their race in legislation regulating their fundamental rights. If it be assumed that such a classification can validly be made under the equal protection clause in circumstances besides those arising from an emergency, the question would remain whether the statute's classification of racial groups is based on differences between those groups bearing a substantial relation to a legitimate legislative objective. (*Barker Bros., Inc.* v. *Los Angeles,* 10 Cal.2d 603, 609 [76 P.2d 97]; *Gulf etc. R. Co.* v. *Ellis,* 165 U.S. 150, 165, 166 [17 S.Ct. 255, 41 L.Ed. 666]; *Quaker City*

*Cab Co.* v. *Pennsylvania,* 277 U. S. 389, 400 [48 S.Ct. 553, 72 L.Ed. 927].) Race restrictions must be viewed with great suspicion, for the Fourteenth Amendment "was adopted to prevent state legislation designed to discriminate on the basis of race or color" (*Railway Mail Ass'n.* v. *Corsi,* 326 U.S. 88, 94 [65 S.Ct. 1483, 89 L.Ed. 2072]; *Williams* v. *International Brotherhood of Boilermakers,* 27 Cal.2d 586, 590 [165 P.2d 903]) and expresses "a definite national policy against discriminations because of race or color." (*James* v. *Marinship Corp.,* 25 Cal.2d 721, 740 [155 P.2d 329, 160 A.L.R. 900].) Any state legislation discriminating against persons on the basis of race or color has to overcome the strong presumption inherent in this constitutional policy. "Only the most exceptional circumstances can excuse discrimination on that basis in the face of the equal protection clause . . ." (*Oyama* v. *California,* 332 U.S. 633 [68 S.Ct. 269, 275, 92 L.Ed. ——].) We shall therefore examine the history of the legislation in question and the arguments in its support to determine whether there are any exceptional circumstances sufficient to justify it.

California's first miscegenation statute (Stats. 1850, ch. 140, p. 424) was enacted at the same time as two other statutes concerning race. It has been held that these three statutes were *in pari materia* and therefore to be read together. (*Estate of Stark,* 48 Cal.App.2d 209, 214 [119 P.2d 961].) The two companion statutes provided: "No black or mulatto person, or Indian, shall be permitted to give evidence in favor of, or against, any white person. Every person who shall have one-eighth part or more of Negro blood shall be deemed a mulatto, and every person who shall have one half of Indian blood shall be deemed an Indian." (Stats. 1850, ch. 99, § 14, p. 230; repealed Code Civ. Proc., § 18, 1872.) "No black, or mulatto person, or Indian, shall be permitted to give evidence in any action to which a white person is a party, in any Court of this State. Every person who shall have one eighth part or more of negro blood, shall be deemed a mulatto; and every person who shall have one half Indian blood, shall be deemed an Indian." (Stats. 1850, ch. 142, § 306, p. 455; repealed Code Civ. Proc., § 18, 1872.)

In 1854, this court held that Chinese (and all others not white) were precluded from being witnesses against white persons on the basis of the statute quoted above. (*People* v. *Hall,* 4 Cal. 399, 404.) The considerations motivating the de-

cision are candidly set forth: ''The anomalous spectacle of a distinct people [Chinese], living in our community, recognizing no laws of this State except through necessity, bringing with them their prejudices and national feuds, in which they indulge in open violation of law; whose mendacity is proverbial; a race of people whom nature has marked as inferior, and who are incapable of progress or intellectual development beyond a certain point, as their history has shown; differing in language, opinions, color, and physical conformation; between whom and ourselves nature has placed an impassable difference, is now presented, and for them is claimed, not only the right to swear away the life of a citizen, but the further privilege of participating with us in administering the affairs of our Government.'' (*People* v. *Hall, supra,* at pp. 404-405.) For these reasons, therefore, ''all races other than Caucasian'' were held to be included in a statute referring only to a ''black or mulatto person, or Indian.''

California courts are not alone in such utterances. Many courts in this country have assumed that human beings can be judged by race and that other races are inferior to the Caucasian. Respondent's position is based upon those premises. He justifies the prohibition of miscegenation on grounds similar to those set forth in the frequently cited case of *Scott* v. *State* (1869), 39 Ga. 321, 324: ''The amalgamation of the races is not only unnatural, but is always productive of deplorable results. Our daily observation shows us, that the offspring of these unnatural connections are generally sickly and effeminate, and that they are inferior in physical development and strength, to the full blood of either race.''[2] Modern experts are agreed that the progeny of marriages between persons of different races are not inferior to both parents.[3] Nevertheless, even if we were to assume that inter-

---

[2] Respondent refers to the following language in *State* v. *Jackson*, 80 Mo. 175, 179 [50 Am.Rep. 499], although stating that ''we have not found any other statement to bear out the biological claims'' therein: ''It is stated as a well authenticated fact that if the issue of a black man and a white woman, and a white man and a black woman intermarry, they cannot possibly have any progeny, and such a fact sufficiently justifies those laws which forbid the intermarriage of blacks and whites, laying out of view other sufficient grounds for such enactments.''

[3] See, Castle, Biological and Sociological Consequences of Race Crossing, 9 Am. J. of Physical Anthropology, pp. 145, 152-153; Linton, Sterling Professor Anthropology, Yale Univ. and President of the American Anthropological Association, 64 Am.Merc. p. 133 (February 1947).

racial marriage results in inferior progeny, we are unable to find any clear policy in the statute against marriages on that ground.

■ Civil Code, section 60, like most miscegenation statutes (see, Vernier, American Family Laws, § 44), prohibits marriages only between "white persons" and members of certain other so-called races. Although section 60 is more inclusive than most miscegenation statutes, it does not include "Indians" or "Hindus" (see, *United States* v. *Bhagat Singh Thind*, 261 U.S. 204, 214-215 [43 S.Ct. 338, 67 L.Ed. 616]); nor does it set up "Mexicans" as a separate category, although some authorities consider Mexico to be populated at least in part by persons who are a mixture of "white" and "Indian." (See, 15 Encyclopedia Britannica, pp. 381-382, 60 Harv.L. Rev. 1156-1158.) Thus, "white persons" may marry persons who would be considered other than white by respondent's authorities, and all other "races" may intermarry freely.

The Legislature therefore permits the mixing of all races with the single exception that white persons may not marry Negroes, Mongolians, mulattoes, or Malays. It might be concluded therefrom that section 60 is based upon the theory that the progeny of a white person and a Mongolian or Negro or Malay are inferior or undesirable, while the progeny of members of other different races are not. Nevertheless, the section does not prevent the mixing of "white" and "colored" blood. It permits marriages not only between Caucasians and others of darker pigmentation, such as Indians, Hindus, and Mexicans, but between persons of mixed ancestry including white. If a person of partly Caucasian ancestry is yet classified as a Mongolian under section 60 because his ancestry is predominantly Mongolian, a considerable mixture of Caucasian and Mongolian blood is permissible. A person having five-eighths Mongolian blood and three-eighths white blood could properly marry another person of preponderantly Mongolian blood. Similarly, a mulatto can marry a Negro. Under the theory of *Estate of Stark*, *supra*, that a mulatto is a person having one-eighth or more of Negro ancestry, a person having seven-eighths white ancestry could marry a Negro. In fact two mulattoes, each of four-eighths white and four-eighths Negro blood, could marry under section 60, and their progeny, like them, would belong as much to one race as to the other. In effect, therefore, section 60 permits a substantial amount of intermarriage between persons of some

Caucasian ancestry and members of other races. Furthermore, there is no ban on illicit sexual relations between Caucasians and members of the proscribed races. Indeed, it is covertly encouraged by the race restrictions on marriage.

Nevertheless, respondent has sought to justify the statute by contending that the prohibition of intermarriage between Caucasians and members of the specified races prevents the Caucasian race from being contaminated by races whose members are by nature physically and mentally inferior to Caucasians.

Respondent submits statistics relating to the physical inferiority of certain races. Most, if not all, of the ailments to which he refers are attributable largely to environmental factors. Moreover, one must take note of the statistics showing that there is a higher percentage of certain diseases among Caucasians than among non-Caucasians.[4] The categorical statement that non-Caucasians are inherently physically inferior is without scientific proof. In recent years scientists have attached great weight to the fact that their segregation in a generally inferior environment greatly increases their liability to physical ailments.[5] In any event, generalizations

---

[4] Between 1930 and 1939 in California deaths resulted most frequently from diseases of the circulatory system, particularly heart diseases. These diseases were most prevalent among white persons, not including Mexicans, with the exception of Chinese, who slightly exceeded white persons. The second most important cause of death was cancer; here, white persons exceeded all others without exception. Tuberculosis, an important cause of death, occurs with greater frequency among Negroes than among white persons, not including Mexicans; but Mexicans, Indians, Chinese and Malays have materially higher death rates owing to tuberculosis than Negroes and Japanese. Diseases of the nervous system occur with less frequency among Indians, Japanese, Mexicans, and Malays than among white persons, Negroes, and Chinese. (The Population of California, Commonwealth Club of California Research Service (1946) pp. 217 et seq.)

Respondent's contention that fertility of Negroes and mulattoes is low is questionable. (See note 3, supra) Dr. S. J. Holmes (1937) The Negro's Struggle for Survival, p. 176, states: ''The fact is that we have not adequate data on a sufficiently large scale to enable us to decide how the mixed origin of the mulatto affects fertility, if it affects it at all.'' Although Negro fertility rates are generally lower than those of white persons, other non-whites far exceed whites in birth rate. Further, the fertility rate of Rural-farm Negroes exceeds that of Rural-farm whites. Scientists give various interpretations of statistics on fertility, analyzing them in the light of environmental as well as hereditary factors. (Population of California, *supra*, pp. 212 et seq.; see I Myrdal, p. 134, ch. 7.)

[5] See, I Myrdal, pp. 140-144; S. J. Holmes, The Negro's Struggle for Survival, p. 130.·

Respondent contends, however, that there is a racial ailment among Negroes known as sickle-cell anemia. According to the Cyclopedia of

based on race are untrustworthy in view of the great variations among members of the same race. The rationalization, therefore, that marriage between Caucasians and non-Caucasians is socially undesirable because of the physical disabilities of the latter, fails to take account of the physical disabilities of Caucasians and fails also to take account of variations among non-Caucasians. The Legislature is free to prohibit marriages that are socially dangerous because of the physical disabilities of the parties concerned. (See, Civ. Code §§ 79.01, 79.06.) The miscegenation statute, however, condemns certain races as unfit to marry with Caucasians on the premise of a hypothetical racial disability, regardless of the physical qualifications of the individuals concerned. If this premise were carried to its logical conclusion, non-Caucasians who are now precluded from marrying Caucasians on physical grounds would also be precluded from marrying among themselves on the same grounds. The concern to prevent marriages in the first category and the indifference about marriages in the second reveal the spuriousness of the contention that intermarriage between Caucasians and non-Caucasians is socially dangerous on physical grounds.

Respondent also contends that Negroes, and impliedly the other races specified in section 60, are inferior mentally to Caucasians. It is true that in the United States catalogues of distinguished people list more Caucasians than members of other races. It cannot be disregarded, however, that Caucasians are in the great majority and have generally had a more advantageous environment, and that the capacity of the members of any race to contribute to a nation's culture depends in large measure on how freely they may participate in that culture. There is no scientific proof that one race is superior to another in native ability.[6] The data on which

Medicine, Surgery and Obstetrics (1946) Vol. 2, p. 746, quoted by respondent, "Statistical studies indicate that 7 to 8 per cent of Negroes show the sickle-cell trait, though not necessarily suffering from sickle-cell anemia." Assuming that the sickle-cell trait is found only in Negroes, despite known extensive intermixture of the races, respondent has shown only the trait and not the prevalence of sickle-cell anemia. Civil Code section 79.01, which requires a premarital blood test, makes no provision for a report on sickle-cell anemia.

[6] See, I Myrdal, pp. 147-148: "These negative conclusions from many decades of the most painstaking scientific labor stand in glaring contrast to the ordinary white American's firm conviction that there are fundamental psychic differences between Negroes and whites. The reason for this contrast is not so much that the ordinary white American has made an error in observation, for most studies of intelligence show that the average Negro in the sample, if judged by performance on the

Caucasian superiority is based have undergone considerable reevaluation by social and physical scientists in the past two decades. Although scientists do not discount the influence of heredity on the ability to score highly on mental tests, there is no certain correlation between race and intelligence. There have been outstanding individuals in all races, and there has also been wide variation in the individuals of all races. In any event the Legislature has not made an intelligence test a prerequisite to marriage. If respondent's blanket condemnation of the mental ability of the proscribed races were accepted, there would be no limit to discriminations based upon the purported inferiority of certain races. It would then be logical to forbid Negroes to marry Negroes, or Mongolians to marry Mongolians, on the ground of mental inferiority, or by sterilization to decrease their numbers.

Respondent contends, however, that persons wishing to marry in contravention of race barriers come from the "dregs of society" and that their progeny will therefore be a burden on the community. There is no law forbidding marriage among the "dregs of society," assuming that this expression is capable of definition. If there were such a law, it could not be applied without a proper determination of the persons that fall within that category, a determination that could hardly be made on the basis of race alone.

Respondent contends that even if the races specified in the statute are not by nature inferior to the Caucasian race, the statute can be justified as a means of diminishing race tension and preventing the birth of children who might become social problems.

---

test, is inferior to the average white person in the sample, and some studies show that the average Negro has certain specific personality differences from the white man, but that he has made an error in inferring that observed differences were innate and a part of 'nature.' He has not been able to discern the influence of gross environmental differences, much less the influence of more subtle life experiences. The fact should not be ignored, however, that he has also made many observational errors, because his observations have been limited and biased." See, also, Ralph Linton, Sterling Professor of Anthropology, Yale University, 64 Am.Merc. pp. 133, 139; Joseph Peterson & Lyle H. Lanier, Studies in the Comparative Abilities of Whites and Negroes, No. 5, Mental Measurement Monographs (1929); Otto Klineberg, A Study of Psychological Differences Between "Racial" and National Groups in Europe, Archives of Psychology, No. 132, vol. XX, (1931); Thomas Russell Garth (1931) Race Psychology, A Study of Racial Mental Differences; I Myrdal, pp. 144-153; Otto Klineberg, (1935) Negro Intelligence and Selective Migration; Ruth Benedict (1943) Race: Science and Politics, pp. 98-147.

It is true that in some communities the marriage of persons of different races may result in tension. Similarly, race tension may result from the enforcement of the constitutional requirement that persons must not be excluded from juries solely on the ground of color, or segregated by law to certain districts within a city. In *Buchanan* v. *Warley*, 245 U.S. 60, 81 [38 S.Ct. 16, 62 L.Ed. 149], the Supreme Court of the United States declared unconstitutional a statute forbidding a "white person" to move into a block where the greater number of residences were occupied by "colored persons" and forbidding a "colored person" to move into a block where the greater number of residences were occupied by "white persons." The contention was made that the "proposed segregation will promote the public peace by preventing race conflicts." The court stated in its opinion that desirable "as this is, and important as is the preservation of the public peace, this aim cannot be accomplished by laws or ordinances which deny rights created or protected by the Federal Constitution." (See, *Cantwell* v. *State*, 310 U.S. 296, 310 [60 S.Ct. 900, 84 L.Ed. 1213, 128 A.L.R. 1352].)

The effect of race prejudice upon any community is unquestionably detrimental both to the minority that is singled out for discrimination and to the dominant group that would perpetuate the prejudice. It is no answer to say that race tension can be eradicated through the perpetuation by law of the prejudices that give rise to the tension. Nor can any reliance be placed on the decisions of the United States Supreme Court upholding laws requiring segregation of races in facilities supplied by local common carriers and schools, for that court has made it clear that in those instances the state must secure equal facilities for all persons regardless of race in order that no substantive right be impaired. (*Sipuel* v. *Board of Regents*, 332 U.S. 631 [68 S.Ct. 299, 92 L.Ed. ——], [16 U.S. Law Week 4090] ; *Missouri ex rel. Gaines* v. *Canada*, 305 U.S. 337, 350-351 [59 S.Ct. 232, 83 L.Ed. 208].) In the present case, however, there is no redress for the serious restriction of the right of Negroes, mulattoes, Mongolians, and Malays to marry; certainly there is none in the corresponding restriction of the right of Caucasians to marry. A member of any of these races may find himself barred by law from marrying the person of his choice and that person to him may be irreplaceable. Human beings are bereft of worth and dignity by a doctrine that would make them as interchangeable as trains.

Respondent relies on *Pace* v. *Alabama,* 106 U.S. 583 [1 S.Ct. 637, 27 L.Ed. 207], in which the United States Supreme Court held constitutional an Alabama statute imposing more severe punishment for adultery or fornication between a white person and a Negro than for such acts between individuals belonging to the same race. The Alabama statute also referred to intermarriage but the court considered the case as one dealing solely with adultery and nonmarital intercourse. We are not required by the facts of this case to discuss the reasoning of *Pace* v. *Alabama* except to state that adultery and nonmarital intercourse are not, like marriage, a basic right, but are offenses subject to various degrees of punishment.

The rationalization that race discrimination diminishes the contacts and therefore the tensions between races would perpetuate the deprivation of rights of racial minorities. It would justify an abridgment of their privilege of holding office, of jury service, of entering the professions. The courts have made it clear that these privileges are not the prerogatives of any race.

It is contended that interracial marriage has adverse effects not only upon the parties thereto but upon their progeny. Respondent relies on *Buck* v. *Bell,* 274 U.S. 200 [47 S.Ct. 584, 71 L.Ed. 1000], for the proposition that the state "may properly protect itself as well as the children by taking steps which will prevent the birth of offspring who will constitute a serious social problem, even though such legislation must necessarily interfere with a natural right." That case, however, involved a statute authorizing sterilization of imbeciles following scientific verification and the observance of procedural guarantees. In *Buck* v. *Bell* the person sterilized was the feeble-minded child of a feeble-minded mother and was herself the mother of an illegitimate feeble-minded child. (See, Welf. & Inst. Code, § 6624.) The inheritability of mental defectiveness does not concern us here, for this case does not involve mentally defective persons. The Supreme Court of the United States later forbade the sterilization of criminals in *Skinner* v. *Oklahoma, supra,* where the Legislature failed to provide a fair hearing and set up illogical and discriminatory categories. The racial categories in the miscegenation law are as illogical and discriminatory as those condemned by the Supreme Court in *Skinner* v. *Oklahoma;* and there is a corresponding lack of a fair hearing.

Respondent maintains that Negroes are socially inferior and have so been judicially recognized (e.g., *Wolfe* v. *Georgia Ry. & Elec. Co.*, 2 Ga.App. 499 [58 S.E. 899, 901]), and that the progeny of a marriage between a Negro and a Caucasian suffer not only the stigma of such inferiority but the fear of rejection by members of both races. If they do, the fault lies not with their parents, but with the prejudices in the community and the laws that perpetuate those prejudices by giving legal force to the belief that certain races are inferior. If miscegenous marriages can be prohibited because of tensions suffered by the progeny, mixed religious unions could be prohibited on the same ground.[7]

There are now so many persons in the United States of mixed ancestry, that the tensions upon them are already diminishing and are bound to diminish even more in time.[8] Already many of the progeny of mixed marriages have made important contributions to the community. In any event the contention that the misceganation laws prohibit interracial marriage because of its adverse effects on the progeny is belied by the extreme racial intermixture that it tolerates.

For many years progress was slow in the dissipation of the insecurity that haunts racial minorities, for there are many who believe that their own security depends on its maintenance. Out of earnest belief, or out of irrational fears, they reason in a circle that such minorities are inferior in health, intelligence, and culture, and that this inferiority proves the need of the barriers of race prejudice.

Careful examination of the arguments in support of the legislation in question reveals that "there is absent the compelling justification which would be needed to sustain discrimination of that nature." (*Oyama* v. *California*, 332 U.S. 633 [68 S.Ct. 269, 272, 92 L.Ed. ——].) Certainly the fact alone that the discrimination has been sanctioned by the state for many years does not supply such justification. (*Shelley* v. *Kraemer*, 334 U.S. 1 [68 S.Ct. 836, 92 L.Ed. ——] ; *Oyama* v. *California, supra*; *Takahashi* v. *Fish & Game Com.*, 334 U.S. 410 [68 S.Ct. 1138, 92 L.Ed. ——] ; see *Winters* v. *New York*, 333 U.S. 507 [68 S.Ct. 665, 92 L.Ed. ——].)

---

[7] Indeed, Father John La Farge, S. J. (1943) The Race Question and The Negro (Permissu Superiorum), p. 196, considers the tensions "not unlike."

[8] See, M. J. Herskovits (1930) The Anthropometry of the American Negro; E. B. Reuter (1931) Race Mixture; I Myrdal, Pp. 132-133, 1360-1361.

### III

Even if a state could restrict the right to marry upon the basis of race alone, sections 60 and 69 of the Civil Code are nevertheless invalid because they are too vague and uncertain to constitute a valid regulation. A certain precision is essential in a statute regulating a fundamental right. ''It is the duty of the lawmaking body in framing laws to express its intent in clear and plain language to the end that the people upon whom it is designed to operate may be able to understand the legislative will.'' (*In re Alpine*, 203 Cal. 731, 736-737 [265 P. 947, 58 A.L.R. 1500] ; cases collected 50 Am.Jur. 484.) ''It is a fundamental rule that no citizen should be deprived of his liberty for the violation of a law which is uncertain and ambiguous.'' (*In re Stewart*, 24 Cal.2d 344, 348 [149 P.2d 689] ; *In re Peppers*, 189 Cal. 682, 686 [209 P. 896] ; *United States* v. *Cohen Grocery Co.*, 255 U.S. 81, 89-92 [41 S.Ct. 298, 65 L.Ed. 516] ; *Lanzetta* v. *New Jersey*, 306 U.S. 451, 453 [59 S.Ct. 618, 83 L.Ed. 888] ; *Connally* v. *General Construction Co.*, 269 U.S. 385, 391 [46 S.Ct. 126, 70 L.Ed. 322].)

The requirement that a law be definite and its meaning ascertainable by those whose rights and duties are governed thereby applies not only to penal statutes, but to laws governing fundamental rights and liberties. (*Standard C. & M. Corp.* v. *Waugh C. Corp.*, 231 N. Y. 51, 54 [131 N.E. 566, 14 A.L.R. 1054] ; *Small Co.* v. *American Sugar Ref. Co.*, 267 U.S. 233, 239 [45 S.Ct. 295, 69 L.Ed. 589] ; see also *State ex rel. Dickason* v. *Harris,* 158 La. 974, 978 [105 So. 33].) Thus, this court in *Hewitt* v. *Board of Medical Examiners,* 148 Cal. 590, 595 [84 P. 39, 113 Am.St.Rep. 315, 7 Ann.Cas. 750, 3 L.R.A.N.S. 896] declared invalid a statute regulating the practice of medicine on the ground that its provisions were too vague and uncertain to govern one's right to practice a profession. In *In re Di Torio*, 8 F.2d 279, 281 it was held that a provision of a statute regulating naturalization of aliens was invalid on the same ground. Although the provision in question seemed clear on its face, the court refused to apply the statute to vacate an order of admission to citizenship because ''An act is void where its language appears on its face to have a meaning, but it is impossible to give it any precise or intelligible application in the circumstances under which it was intended to operate.'' (*In re Di Torio, supra* at 281 and cases there cited.)

Section 60 of the Civil Code declares void all marriages of white persons with Negroes, Mongolians, members

of the Malay race or mulattoes. In this section, the Legislature has adopted one of the many systems classifying persons on the basis of race. Racial classifications that have been made in the past vary as to the number of divisions and the features regarded as distinguishing the members of each division. The number of races distinguished by systems of classification "varies from three or four to thirty-four." (Boas, 7 Encyclopedia of Soc. Sciences, 25, 26.) The Legislature's classification in section 60 is based on the system suggested by Blumenbach early in the nineteenth century. (*Roldan* v. *Los Angeles County*, 129 Cal.App. 267, 273 [18 P.2d 706].) Blumenbach classified man into five races: Caucasian (white), Mongolian (yellow), Ethiopian (black), American Indian (red), and Malayan (brown). Even if that hard and fast classification be applied to persons all of whose ancestors belonged to one of these racial divisions,[8a] the Legislature has made no provision for applying the statute to persons of mixed ancestry. The fact is overwhelming that there has been a steady increase in the number of people in this country who belong to more than one race, and a growing number who have succeeded in identifying themselves with the Caucasian race even though they are not exclusively Caucasian. Some of these persons have migrated to this state; some are born here illegitimately; others are the progeny of miscegenous marriages valid where contracted and therefore valid in California. (*Pearson* v. *Pearson*, 51 Cal. 120, 125.) The apparent purpose of the statute is to discourage the birth of children of mixed ancestry within this state. Such a purpose, however, cannot be accomplished without taking into consideration marriages of persons of mixed ancestry. A statute regulating fundamental rights is clearly unconstitutional if it cannot be reasonably applied to accomplish its purpose. This court therefore cannot determine the constitutionality of the statute in question on the assumption that its provisions might, with sufficient definiteness, be applied to persons not of mixed ancestry.

The only reference made in the statute to persons of mixed ancestry is the prohibition of marriages between a "white person" and a "mulatto." Even the term "mulatto" is not defined. The lack of a definition of that term leads to a special problem of how the statute is to be applied to a

---

[8a] See Julian S. Huxley and H. C. Haddon (1936) We Europeans, A Survey of "Racial" Problems, 1-15, 82, 106, 115-131, 215-236.

person, some but not all of whose ancestors are Negroes.[9]  The only case in this state attempting to define the term "mulatto" in section 60 of the Civil Code leaves undecided whether a person with less than one-eighth Negro blood is a "mulatto" within the meaning of the statute. (*Estate of Stark,* 48 Cal. App.2d 209, 214 [119 P.2d 961].) Even more uncertainty surrounds the meaning of the terms "white persons," "Mongolians," and "members of the Malay race."

If the statute is to be applied generally to persons of mixed ancestry the question arises whether it is to be applied on the basis of the physical appearance of the individual or on the basis of a genealogical research as to his ancestry. If the physical appearance of the individual is to be the test, the statute would have to be applied on the basis of subjective impressions of various persons. Persons having the same parents and consequently the same hereditary background could be classified differently. On the other hand, if the application of the statute to persons of mixed ancestry is to be based on genealogical research, the question immediately arises what proportions of Caucasian, Mongolian, or Malayan ancestors govern the applicability of the statute. Is it any trace of Mongolian or Malayan ancestry, or is it some unspecified proportion of such ancestry that makes a person a Mongolian or Malayan within the meaning of section 60?

To determine that a person is a Mongolian or Malayan within the meaning of the statute because of any trace of

[9] Black's Law Dictionary (3d ed.) defines a mulatto as "A person that is the offspring of a negress by a white man, or of a white woman by a negro. . . . In a more general sense, a person of mixed Caucasian and negro blood, or Indian and Negro blood. . . . Properly a mulatto is a person one of whose parents is wholly black and the other wholly white; but the word does not always, though perhaps it does generally, require so exactly even a mixture of blood, nor is its signification alike in all the states. . . ." The same source defines a Negro as follows: "The word 'negro' means a black man, one descended from the African race, and does not commonly include a mulatto. . . . But the laws of the different states are not uniform in this respect, some including in the description 'negro' one who has one-eighth or more of African blood. Term 'negro' means necessarily person of color, but not every person of color is a 'negro'." The foregoing definitions of "Mulatto" and "Negro" are substantially the same as the definitions contained in Bouvier's Law Dictionary.

See also I Myrdal, An American Dilemma, p. 113: "Legislation in this respect tends to conform to social usage, although often it is not so exclusive. In some states one Negro grandparent defines a person as a Negro for legal purposes, in other states any Negro ancestor—no matter how far removed—is sufficient. In the Southern states definitions of who is a Negro are often conflicting. Since reconstruction, there has been a tendency to broaden the definition. The Northeastern states generally have no definition of Negro in law."

such ancestry, however slight, would be absurd. If the classification of a person of mixed ancestry depends upon a given proportion of Mongolians or Malayans among his ancestors, how can this court, without clearly invading the province of the Legislature, determine what that decisive proportion is? (See, *Pacific Coast etc. Bank* v. *Roberts,* 16 Cal.2d 800, 805 [108 P.2d 439].) Nor can this court assume that a predominance in number of ancestors of one race makes a person a Caucasian, Mongolian, or Malayan within the meaning of the statute, for absurd results would follow from such an assumption. Thus, a person with three-sixteenths Malay ancestry might have many so-called Malay characteristics and yet be considered a white person in terms of his preponderantly white ancestry. Such a person might easily find himself in a dilemma, for if he were regarded as a white person under section 60, he would be forbidden to marry a Malay, and yet his Malay characteristics might effectively preclude his marriage to another white person. Similarly, a person having three-eighths Mongolian ancestry might legally be classed as a white person even though he possessed Mongolian characteristics. He might have little opportunity or inclination to marry any one other than a Mongolian, yet section 60 might forbid such a marriage. Moreover, if a person were of four-eighths Mongolian or Malayan ancestry and four-eighths white ancestry, a test based on predominance in number of ancestors could not be applied.

Section 69 of the Civil Code and section 60 on which it is based are therefore too vague and uncertain to be upheld as a valid regulation of the right to marry. Enforcement of the statute would place upon the officials charged with its administration and upon the courts charged with reviewing the legality of such administration the task of determining the meaning of the statute. That task could be carried out with respect to persons of mixed ancestry only on the basis of conceptions of race classification not supplied by the Legislature. ''If no judical certainty can be settled upon as to the meaning of a statute, the courts are not at liberty to supply one.'' (*In re Di Torio,* 8 F.2d 279, 281.)

In summary, we hold that sections 60 and 69 are not only too vague and uncertain to be enforceable regulations of a fundamental right, but that they violate the equal protection of the laws clause of the United States Constitution by impairing the right of individuals to marry on the basis of race

alone and by arbitrarily and unreasonably discriminating against certain racial groups.

Let the peremptory writ issue as prayed.

Gibson, C. J., and Carter, J., concurred.

CARTER, J., concurring.—It is my considered opinion that the statutes here involved (Civ. Code, §§ 60, 69) are the product of ignorance, prejudice and intolerance, and I am happy to join in the decision of this court holding that they are invalid and unenforceable. This decision is in harmony with the declarations contained in the Declaration of Independence which are guaranteed by the Bill of Rights and the Fourteenth Amendment to the Constitution of the United States and reaffirmed by the Charter of the United Nations, that all human beings have equal rights regardless of race, color or creed, and that the right to liberty and the pursuit of happiness is inalienable and may not be infringed because of race, color or creed. To say that these statutes may stand in the face of the concept of liberty and equality embraced within the ambit of the above-mentioned fundamental law is to make of that concept an empty, hollow mockery.

The Declaration of Independence declares: "We hold these truths to be self evident: That all men are created equal; that they are endowed by their Creator with certain unalienable rights; that among these are life, liberty and the pursuit of happiness; . . ."

The Fifth Amendment to the Constitution of the United States provides that: "No person shall be deprived of life, liberty or property without due process of law."

The Fourteenth Amendment to the Constitution of the United States provides: "Section 1. All persons born or naturalized in the United States, and subject to the jurisdiction thereof, are citizens of the United States and of the State wherein they reside. No State shall make or enforce any law which shall abridge the privileges or immunities of citizens of the United States; nor shall any State deprive any person of life, liberty, or property, without due process of law; nor deny to any person within its jurisdiction the equal protection of the laws."

The Charter of the United Nations contains the following declaration: "WE THE PEOPLES OF THE UNITED NATIONS DETERMINED: . . . to reaffirm faith in fundamental human rights, in the dignity and worth of the human person, in the

equal rights of men and women and of nations large and small . . . to promote social progress and better standards of life in larger freedom, . . . And for these ends . . . to practice tolerance . . .'' (Preamble.) ''. . . in promoting and encouraging respect for human rights and for fundamental freedoms for all without distinction as to race, sex, language, or religion . . .'' (Ch. I, art. I, § 3.)

In the face of these authoritative pronouncements the matter of race equality should be a settled issue. It is, at least, a settled issue so far as the fundamental law is concerned. And the only question before us is whether the Legislature may enact a valid statute in direct conflict with this fundamental law. It seems clear to me that it is not possible for the Legislature, in the face of our fundamental law, to enact a valid statute which proscribes conduct on a purely racial basis. Such are the statutes here involved. The wisdom of the broad, liberal concept of liberty and equality declared in our fundamental law should be apparent to every unprejudiced mind.

The Apostle Paul declared that: ''God . . . hath made of one blood all nations of men for to dwell on all the face of the earth, and hath determined the times before appointed, and the bounds of their habitation.'' (The Acts of the Apostles, ch. 17, v. 26.)

Cedric Dover writes in his book ''Half-Caste'': ''Perhaps our Neanderthal ancestors arose from mixture between ape-men of the Ice Age. Perhaps our Neolithic prototypes emerged from relations between the Aurignacian invaders of Europe and the local Neanderthals. We shall be content with the knowledge that miscegenation has influenced human evolution from the earliest times, that there has not been a pure race of our species for at least ten thousand years.''

In a letter to Chastellux in 1785 Thomas Jefferson wrote: ''I have supposed the black man, in his present state, might not be in body and mind equal to the white man; but it would be hazardous to affirm that, equally cultivated for a few generations, he would not become so.'' Notwithstanding this statement, Jefferson, who was the author of the Declaration of Independence, made it clear that the Negro is entitled to enjoy equally with others the ''unalienable rights of life, liberty and the pursuit of happiness.''

The Declaration of Independence is a part of the law of our land. It is to be found as part of the Statutes at Large

734

on page 1 of volume 1. It has been given effect as a legislative enactment (*Inglis* v. *Trustees of the Sailor's Snug Harbor,* 28 U.S. (3 Pet.) 99 [7 L.Ed. 617], and other cases cited in U.S.C.A., 1 Constitution, pp. 7, 8; *Fidelity & Casualty Co. of New York* v. *Union Savings Bank Co.,* 29 Ohio App. 154 [163 N.E. 221]). It declares that: "All men are created equal; that they are endowed by their Creator with certain unalienable rights; that among these are life, liberty and the pursuit of happiness; . . ." No one will question that, so far as petitioners are concerned, this case involves the pursuit of happiness in its clearest and most universally approved form.

It is a matter of law as well as historical knowledge that after the Revolution all men were not, in law, equal (*Dred Scott* v. *Sanford,* 19 How. (U.S.) 393 [15 L.Ed. 691]). But it is well to remember that men fought, bled, and died for the truth of the proposition.

In the Dred Scott case, *supra,* the truth of the proposition was questioned and denied in an opinion by Chief Justice Taney. It is again a matter of historical knowledge that this decision helped to kindle the fire which brought on the Civil War. In this war men fought, bled and died for their belief in the essential equality of man.

Abraham Lincoln, in his never-to-be-forgotten Gettysburg Address, told *us,* because he was speaking to the future as well as of the past, that "Four score and seven years ago our fathers brought forth upon this continent, a new nation, conceived in Liberty, and dedicated to the proposition that all men are created equal." He asked whether "[A]ny nation, so conceived and so dedicated, can long endure." The Civil War was supposed to definitely and conclusively answer that question. This being so, should a state, or even a number of states, *legislate* to destroy that ideal when great wars have been fought to preserve it? An ideal for which men gave their lives and the lives of their families should be a precious heritage to be carefully guarded. And yet all men are not *now* being given equal treatment!

The freedom to marry the person of one's choice has not always existed, and evidently does not exist here today. But is not that one of the fundamental rights of a free people? Blackstone said that: "Liberty consists in being limited only by that Supreme Law which is the expression of abstract right." If the right to marry is a fundamental right, then it must be conceded that an infringement of that right by

means of a racial restriction is an unlawful infringement of one's liberty. It is immaterial that perhaps only a few would wish to marry persons not of their own race or color. It *is* material that the few who do so desire have the *right* to make that choice. It is only ignorance, prejudice and intolerance which denies it. Since this state will recognize as valid a marriage performed in another state between members of these two races it follows that the marriage cannot be considered vitally detrimental to the public health, welfare and morals.

The Constitution of the State of California, article I, section 13, provides that no person shall be deprived of life, liberty or property without due process of law. Due process of law consists not only of the individual's right to procedural due process, but his right to substantive due process—that the state, through legislation, shall not deprive him of one of his "liberties."

Our Constitution, like the Constitution of the United States, is a restriction upon the powers of the state. Upon this court devolves the duty of guarding that Constitution and the rights it protects, as upon the Supreme Court of the United States devolves the duty of guarding the Constitution of the United States.

The student of constitutional law knows that the Civil War amendments to the Constitution did not accomplish their intended purpose, which was to create a real, over-all equality such as the Declaration of Independence contemplated, and which such cases as the Dred Scott case prevented from being realized. (Waite, *The Negro in the Supreme Court,* 30 Minn. L.Rev. 219.)

In the years following the adoption of the Thirteenth, Fourteenth and Fifteenth Amendments, many courts still did not think that there was real equality among men despite the fact that the language of the amendments is quite clear. Another round of the vicious circle was begun, this time by limiting as far as possible the language of the amendments. Many cases might be cited to support this view, but the hardest blow to liberal minded persons—the biggest step backwards into days of slavery—was the decision in *Plessy* v. *Ferguson,* 163 U.S. 537 [16 S.Ct. 1138, 41 L.Ed. 256]. That case involved a Louisiana statute which provided that railroads must provide "equal but separate" accommodations for white and colored passengers, and that, under penalty,

no member of either group should be permitted to use the accommodations provided for the other. The Supreme Court upheld the statute, and laid down the rule that the state had power to make regulations of this kind "in good faith for the promotion of the public good." The court also said that the question came down to the "reasonableness of the regulation." (*Plessy* v. *Ferguson, supra,* p. 537.) By using that language, however, the Supreme Court left the door open for a future, more enlightened generation. For, if the reasonableness of the regulation is the only test, it may and will happen that a regulation was reasonable from the point of view of the Legislature enacting it and the court first passing on it. And yet, in the light of future developments, all the reasonableness may have been lost and the regulation may have reduced itself to a mere tool of oppression—a hangover from quaint and superstitious days of yore. There are enough statutes of this kind to fill periodically a column in Collier's magazine. Most statutes thus rendered obsolete are not especially vicious, and most of them are not enforced. It is safe to assume that most of them would be struck down today if their constitutionality were challenged, because what once may have appeared reasonable has become an absurdity.

It is, of course, conceded that the state in the exercise of the police power may legislate for the protection of the health and welfare of the people and in so doing may infringe to *some* extent on the rights of individuals. But it is not conceded that a state may legislate to the detriment of a class—a minority who are unable to protect themselves, when such legislation has no valid purpose behind it. Nor may the police power be used as a guise to cloak prejudice and intolerance. Prejudice and intolerance are the cancers of civilization.

It is my position that the statutes now before us never were constitutional. When first enacted, they violated the supreme law of the land as found in the Declaration of Independence. It is further my position that the Fourteenth Amendment to the Constitution of the United States invalidated the statutes here involved. In a powerful dissent in *Plessy* v. *Ferguson, supra,* Justice Harlan said, at page 559: "Our Constitution is color-blind, and neither knows nor tolerates classes among citizens. In respect of civil rights, all citizens are equal before the law. . . . The law regards man as man, and takes no account of his surroundings or of his color when his civil rights as guaranteed by the supreme

law of the land are involved . . . the judgment this day rendered will, in time, prove to be quite as pernicious as the decision made by this tribunal in the *Dred Scott case.*'' This language needs no elaboration. The time at which this judgment has become pernicious has arrived.

Even if I concede, which I do not, that the statutes here involved were at any time reasonable, they are no longer reasonable and therefore no longer valid today. The rule is that the constitutionality of a statute is not determined once and for all by a decision upholding it. A change in conditions may invalidate a statute which was reasonable and valid when enacted (*Nashville, C. & St. L. Ry. Co.* v. *Walters,* 294 U.S. 405 [55 S.Ct. 486, 79 L.Ed. 949], 16 C.J.S. 150).

In this case, there are no decisions of either this court or the Supreme Court of the United States which uphold the validity of a statute forbidding or invalidating miscegenous marriages. As has been pointed out, even if there were precedent, it would not necessarily be binding in this case. The cases from other jurisdictions are, of course, not binding here. Under the test laid down by the United States Supreme Court in *Plessy* v. *Ferguson, supra,* the reasonableness of the regulation is therefore the decisive factor. And there are decisions rendered in this state which definitely point the way as to what is to be considered ''reasonable'' and in accord with the public policy of this state.

This court has upheld the validity of miscegenous marriages, so-called, when the marriage was entered into in a jurisdiction where no prohibition existed (*Pearson* v.. *Pearson,* 51 Cal. 120, 125). Under the well-settled rules of the law of Conflict of Laws, this court could have denied validity to such marriages, provided they were ''odious'' to its own internal policy. It did not do so, and it has indicated in other holdings in which the problem of miscegenation was collaterally involved that it does not consider the internal policy of this state one which would lead it to refuse validity to such marriages (Rest. of Conflicts of Laws, § 132 (c)).

Some of the statutes of the type here under attack have been upheld as reasonably designed to prevent race rioting. The fact that this court grants recognition to foreign miscegenous marriages, valid where contracted, is enough to rebut that argument. Riots would either follow in both cases or in none. One author sums up the problem by asking: ''Does this not mean that the miscegenation statute applies only to

those who either have an inadequate knowledge of the law and/or cannot afford the train fare to a state where the attempted marriage would be valid?'' (Tragen, 32 Cal.L. Rev. 269, 277.)

So far as the policy of this court is concerned, there is no basis for upholding the statutes. But it is said that it is not the policy of the court but that of the Legislature which should control. And there again, there are strong indications of legislative trends and intentions which point the way. So far as employment under public contracts is concerned, the laws of this state forbid discrimination based on color (Lab. Code, § 1735). So far as civil rights other than the right to marry are concerned, they are guaranteed by Civil Code, section 52. The statutes forbidding miscegenous marriages here under attack are further distinguished from statutes in other jurisdictions in that they are entirely declaratory, while all the others carry with them penalties for violation. This, too, would indicate an attitude of comparative indifference on part of the Legislature, and the absence of any clearly expressed public sentiment or policy.

The legislation here under attack is also sought to be sustained on the ground that a legislative enactment duly made and based on ''some evidence'' is presumptively valid. The general rule to that effect may be conceded. But it does not apply to a case of this kind. In cases involving discrimination, the rule is that laid down by the Supreme Court of the United States in *Korematsu* v. *United States,* 323 U.S. 214, 216 [65 S.Ct. 193, 194, 89 L.Ed. 194, 199], where the court speaking through Mr. Justice Black said: ''. . . all legal restrictions which curtail the civil rights of a single racial group are immediately suspect . . . courts must subject them to the most rigid scrutiny. Pressing public necessity may sometimes justify the existence of such restrictions; racial antagonism never can.'' That suspicion which attaches to cases involving discrimination is sufficient to overcome the presumption of validity and constitutionality normally present when a statute is attacked as unconstitutional.

Finally, the statute is sought to be upheld for ''sociological'' reasons. The evidence presented to sustain the statute and that tending to show it up as unreasonable falls into two groups. One is concerned with the social effect of such marriages on the parties and those close to them. That social ostracism may well result to the parties and perhaps their offspring, may be conceded. But that is something

which the state is powerless to control and which it cannot prevent by legislation. It therefore furnishes no basis for legislation, either. It is something resting with the parties themselves, for them to decide. If they choose to face this possible prejudice and think that their own pursuit of happiness is better subserved by entering into this marriage with all its risks than by spending the rest of their lives without each other's company and comfort, the state should not and cannot stop them.

The other aspect of the evidence adduced is the medico-eugenic one. A great deal has been written and said about the desirability or undesirability of racial mixtures. The writers seem to be in such hopeless conflict that their lack of bias may well be questioned. Suffice it to quote the following from petitioner's brief:

''The blood-mixing however, with the lowering of the racial level caused by it, is the sole cause of the dying-off of old cultures; for the people do not perish by lost wars, but by the loss of that force of resistance which is contained only in the pure blood.

''All that is not race in this world is trash.''

''The result of any crossing, in brief, is always the following: (a) lowering of the standard of the higher race, (b) physical and mental regression, and, with it, the beginning of slowly but steadily progressive lingering illness.''

''Every race-crossing leads necessarily sooner or later to the decline of the mixed product. The danger for the mixed product is abolished only in the moment of the bastardization of the last higher, racially pure element.''

''. . . [T]here is only one most sacred human right, and this right is at the same time the most sacred obligation, namely, to see to it that the blood is preserved pure, so that by its preservation of the best human material a possibility is given for a more noble development of these human beings.''

This quotation is from Hitler's ''Mein Kampf'' as published in translation in New York in 1940. To bring into issue the correctness of the writings of a madman, a rabble-rouser, a mass-murderer, would be to clothe his utterances with an undeserved aura of respectability and authoritativeness. Let us not forget that this was the man who plunged the world into a war in which, for the third time, Americans fought, bled, and died for the truth of the proposition that all men are created equal.

We may take judicial notice of the fact—since it is a political and historical fact—that steady inroads have been made on the myth of racial superiority and its outgrowths.

The rest of the world never has understood and never will understand why and how a nation, built on the premise that all men are created equal, can three times send the flower of its manhood to war for the truth of this premise and still fail to carry it out within its own borders.

In 1682, Lord Nottingham said in the course of an opinion: "Pray let us so resolve Cases here, that they may stand with the Reason of Mankind when they are debated abroad. Shall that be Reason here that is not Reason in any part of the World besides?" (*Duke of Norfolk's Case,* 3 Ch.Cas. 1, 33, 22 Eng.Repr. 931, 935.)

In my opinion, the statutes here involved violate the very premise on which this country and its Constitution were built, the very ideas embodied in the Declaration of Independence, the very issue over which the Revolutionary War, the Civil War, and the Second World War were fought, and the spirit in which the Constitution must be interpreted in order that the interpretations will appear as "Reason in any part of the World besides."

EDMONDS, J.—I agree with the conclusion that marriage is "something more than a civil contract subject to regulation by the state; it is a fundamental right of free men." Moreover, it is grounded in the fundamental principles of Christianity. The right to marry, therefore, is protected by the constitutional guarantee of religious freedom, and I place my concurrence in the judgment upon a broader ground than that the challenged statutes are discriminatory and irrational.

In *Cantwell* v. *Connecticut,* 310 U.S. 296 [60 S.Ct. 900, 84 L.Ed. 1213, 128 A.L.R. 1352] (1940), the United States Supreme Court, for the first time expressly held that, through the due process clause of the Fourteenth Amendment, a state statute may be declared invalid if it violates the specific guarantee of religious freedom as stated in the First Amendment. The consequences of that decision were forcefully stated by Mr. Justice Jackson in *West Virginia State Board of Education* v. *Barnette,* 319 U.S. 624, 639 [63 S.Ct. 1178, 87 L.Ed. 1628, 147 A.L.R. 674], as follows: "In weighing arguments of the parties it is important to distinguish between the due process clause of the Fourteenth Amendment as an instrument of transmitting the principles of the First Amendment and

those cases in which it is applied for its own sake. The test of legislation which collides with the Fourteenth Amendment, because it also collides with the principles of the First, is much more definite than the test when only the Fourteenth is involved. Much of the vagueness of the due process clause disappears when the specific prohibitions of the First become its standard. The right of a State to regulate, for example, a public utility may well include, so far as the due process test is concerned, power to impose all of the restrictions which a legislature may have a 'rational basis' for adopting. But freedom of speech and of press, of assembly, and of worship may not be infringed on such slender grounds. They are susceptible of restriction only to prevent grave and immediate danger to interests which the State may lawfully protect.''

Reasonable classification, therefore, is not the test to be applied to a statute which interferes with one of the fundamental liberties which are protected by the First Amendment. The question is whether there is any ''clear and present danger'' justifying such legislation (*Craig* v. *Harney*, 331 U.S. 367, 372 [67 S.Ct. 1249, 91 L.Ed. 1546] ; *Pennekamp* v. *Florida*, 328 U.S. 331, 333 [66 S.Ct. 1029, 90 L.Ed. 1295] ; *Cantwell* v. *Connecticut*, *supra*, at p. 311; *Herndon* v. *Lowry*, 301 U.S. 242, 256 [57 S.Ct. 732, 81 L.Ed. 1066] ; *Schenck* v. *United States*, 249 U.S. 47, 52 [39 S.Ct. 247, 63 L.Ed. 470]), and the burden of upholding the enactment is upon him who asserts that the acts which are denounced do not infringe the freedom of the individual. (*Busey* v. *District of Columbia*, 138 F.2d 592, 595.)

In the present case, the respondent does not claim that there is any clear and present danger justifying the restrictions imposed by sections 60 and 69 of the Civil Code. In 18 states, including New York, Illinois and Pennsylvania, where about 10 per cent of the Negroes of the United States reside, there are no such limitations. The population of California, to a large extent, is made up of people who have come to it from other sections of the country, and if there are undesirable consequences of interracial marriages, the challenged legislation is an ineffective means of meeting the problem.

The decisions upholding state statutes prohibiting polygamy come within an entirely different category. In *Reynolds* v. *United States*, 98 U.S. 145 [25 L.Ed. 244], marriage was said to be, ''from its very nature a sacred obligation,'' but the conviction was sustained upon the ground that polygamy

violates "the principles upon which the government of the people, to a greater or less extent, rests." Later, the court characterized the practice of polygamy as being "contrary to the spirit of Christianity and of the civilization which Christianity has produced in the Western world" (*Church of Jesus Christ of L. D. S.* v. *United States,* 136 U.S. 1 [10 S.Ct. 792, 34 L.Ed. 478] ; see *Davis* v. *Beason,* 133 U.S. 333 [10 S.Ct. 299, 33 L.Ed. 637] ). In effect, therefore, these cases rest upon the principle that the conduct which the legislation was designed to prevent constituted a clear and present danger to the well being of the nation and, for that reason, the statute did not violate constitutional guarantees.

SHENK, J.—I dissent.

The power of a state to regulate and control the basic social relationship of marriage of its domiciliaries is here challenged and set at nought by a majority order of this court arrived at not by a concurrence of reasons but by the end result of four votes supported by divergent concepts not supported by authority and in fact contrary to the decisions in this state and elsewhere.

It will be shown that such laws have been in effect in this country since before our national independence and in this state since our first legislative session. They have never been declared unconstitutional by any court in the land although frequently they have been under attack. It is difficult to see why such laws, valid when enacted and constitutionally enforceable in this state for nearly 100 years and elsewhere for a much longer period of time, are now unconstitutional under the same Constitution and with no change in the factual situation. It will also be shown that they have a valid legislative purpose even though they may not conform to the sociogenetic views of some people. When that legislative purpose appears it is entirely beyond judicial power, properly exercised, to nullify them.

This proceeding, therefore, involves a most important state function long since recognized as such. Indeed as late as June 7, 1948, it has been recognized by the Supreme Court of the United States "that the regulation of the incidents of the marital relation involves the exercise by the states of powers of the most vital importance." (*Sherrer* v. *Sherrer,* 334 U.S. 343 [68 S.Ct. 1087, 92 L.Ed. ——].) Because of the far-reaching effect of an order of this court in connection

with this basic social relationship the subject is worthy of somewhat extended discussion in support of our statutes.

According to the verified petition for the writ of mandamus to compel the issuance of a marriage license, Andrea D. Perez is a white person and Sylvester S. Davis, Jr., is a Negro. Respondent county clerk rests his refusal to issue a certificate and license to them on the ground that he is expressly prohibited from so doing by the provisions of section 69 of the Civil Code, and upon the further ground that their purported marriage in this state would be illegal and void. (Civ. Code, § 60.)

Section 69 of the Civil Code contains the following proviso: ". . . no license may be issued authorizing the marriage of a white person with a Negro, mulatto, Mongolian or member of the Malay race." And complementary section 60 of the same code reads: "All marriages of white persons with negroes, Mongolians, members of the Malay race, or mulattoes are illegal and void."

Petitioners first contend that the above quoted statutory provisions deprive them of the religious freedom guaranteed by the First and Fourteenth Amendments of the federal Constitution and article I, section 4, of the Constitution of this state. They allege that they are members and communicants of the Roman Catholic Church; that it is the dogma, belief and teaching of the church that a person of the white race and a person of the Negro race, if otherwise eligible, are entitled to receive conjointly the sacrament of matrimony and to intermarry; that the refusal of respondent to issue the license denies to them the right to participate fully in the sacramental life of the religion in which they believe, prohibits the free exercise by them of their religion, and violates the guaranty of the free exercise and enjoyment of their religious profession and worship. It is further alleged that section 69 of the Civil Code is arbitrary, capricious and without reasonable relation to any purpose within the competency of the state to effect.

Respondent on the other hand contends that the classifications contained in sections 60 and 69 of the Civil Code do not transgress the petitioners' freedom of religious worship; that such classifications are reasonably designed to promote the general welfare and the interests of individual members of the races mentioned, and that the regulation is therefore a proper exercise of the police power of the state.

At the outset it may be noted that the petitioners' alleged right to marry is not a part of their religion in the broad sense that it is a duty enjoined by the church, or that penalty and punishment may in some manner ensue (cf. *Reynolds* v. *United States,* 98 U.S. 145, 161 [25 L.Ed. 244]); but rather that their marriage is permissive under the dogma, beliefs and teaching of the church to which they claim membership and that the sacrament of matrimony will be administered to them by a priest of the church if and when a license issues. In this connection Father John La Farge, executive editor of "America," the national Catholic weekly, in a book entitled "The Race Question and The Negro" (Permissu Superiorum), (1943), states at page 196: "The Catholic Church does not impose any impediment, *diriment* impediment, upon racial intermarriage, in spite of the Church's great care to preserve in its utmost purity the integrity of the marriage bond.

"On the other hand, where such intermarriages are prohibited by law, as they are in several states of the Union, the Church bids her ministers to respect these laws, and to do all that is in their power to dissuade persons from entering into such unions."

The foregoing is mentioned to show that the attitude of the church has no particular bearing on the asserted rights of the petitioners. Its attitude is one of respect for local laws and an admonition to its clergy to advise against their infringement.

Other considerations are presented in connection with petitioners' contentions that their religious liberty is being infringed. The First Amendment to the United States Constitution declares that Congress shall make no law respecting an establishment of religion or prohibit the free exercise thereof. The due process of law clause of the Fourteenth Amendment embraces this fundamental concept of liberty as expressed in the First Amendment and renders the states likewise incompetent to transgress it. However, this religious liberty "embraces two concepts,—freedom to believe and freedom to act. The first is absolute but, in the nature of things, the second cannot be." (*Cantwell* v. *Connecticut,* 310 U.S. 296, 303 [60 S.Ct. 900, 84 L.Ed. 1213, 128 A.L.R. 1352]; *Murdock* v. *Pennsylvania,* 319 U.S. 105, 110 [63 S.Ct. 870, 891, 87 L.Ed. 1292, 146 A.L.R. 81]; *Gospel Army* v. *City of Los Angeles,* 27 Cal.2d 232 [163 P.2d 704].) It has long

been held that conduct, consisting of practices and acts, remains subject to regulation for the health, safety and general welfare. For example, a legislative determination that monogamy is the "law of social life" has been held to prevail over the practice of polygamy and bigamy as a duty required, encouraged or suffered by religion. (*Reynolds* v. *United States, supra,* 98 U.S. 145; *Davis* v. *Beason,* 133 U.S. 333 [10 S.Ct. 299, 33 L.Ed. 637] ; *Cleveland* v. *United States,* 329 U.S. 14 [67 S.Ct. 13, 91 L.Ed. 12].)

The reasoning behind this construction of the Constitution is obvious. The determination of proper standards of behavior must be left to the Congress or to the state legislatures in order that the well being of society as a whole may be safeguarded or promoted. The protection of the individual's exercise of religious worship afforded by our state Constitution, article I, section 4, corresponds with that furnished by the federal guaranty as interpreted by the United States Supreme Court. Our Constitution expressly provides that the free exercise of religion guaranteed "shall not be so construed as to . . . justify practices inconsistent with the peace or safety of this State."

Moreover, the right of the state to exercise extensive control over the marriage contract has always been recognized. The institution of matrimony is the foundation of society, and the community at large has an interest in the maintenance of its integrity and purity. (*Sharon* v. *Sharon,* 75 Cal. 1 [16 P. 345] ; 16 Cal.Jur. 909.) The Supreme Court of the United States has stated: "Marriage, as creating the most important relation in life, as having more to do with the morals and civilization of a people than any other institution, has always been subject to the control of the legislature." (*Maynard* v. *Hill,* 125 U.S. 190, 205 [8 S.Ct. 723, 31 L.Ed. 654].) And: "Marriage, while from its very nature a sacred obligation, is nevertheless, in most civilized nations, a civil contract, and usually regulated by law. Upon it society may be said to be built, and out of its fruits spring social relations and social obligations and duties, with which government is necessarily required to deal." (*Reynolds* v. *United States, supra,* 98 U.S. 145, 165.) In the language of the Supreme Court of Missouri: "The right to regulate marriage, the age at which persons may enter into that relation, the manner in which the rites may be celebrated, and the persons between whom it may be contracted, has been assumed and exercised by every

civilized and Christian nation." (*State* v. *Jackson*, 80 Mo. 175, 179 [50 Am.Rep. 499].) Further: "There can be no doubt as to the power of every country to make laws regulating the marriage of its own subjects; to declare who may marry, how they may marry, and what shall be the legal consequences of their marrying. The right to regulate the institution of marriage; to classify the parties and persons who may lawfully marry; to dissolve the relation by divorce; and to impose such restraints upon the relation as the laws of God, and the laws of propriety, morality and social order demand, has been exercised by all civilized governments in all ages of the world." (*Kinney* v. *The Commonwealth*, 30 Gratt. (Va.) 858, 862 [32 Am.Rep. 690].)

It is apparent from what has been said that if the law under attack bears a substantial relationship to the health, safety, morals or some other phase of the general welfare of the people of this state, it would not be invalid because incidentally in conflict with the conduct and practice of a particular religious group. Similarly if there is a rational basis for the law, if it is reasonable, and all within a given class are treated alike, there is no violation of the due process or equal protection clauses of the Fourteenth Amendment to the United States Constitution. (See *Missouri ex rel. Gaines* v. *Canada*, 305 U.S. 337 [59 S.Ct. 232, 83 L.Ed. 208] ; *Buck* v. *Bell*, 274 U.S. 200 [47 S.Ct. 584, 71 L.Ed. 1000] ; *Radice* v. *New York*, 264 U.S. 292 [44 S.Ct. 325, 68 L.Ed. 690] ; *Patsone* v. *Pennsylvania*, 232 U.S. 138 [34 S.Ct..281, 58 L.Ed. 539] ; *Noble State Bank* v. *Haskell*, 219 U.S. 104 [31 S.Ct. 186, 55 L.Ed. 112].)

The prohibition of miscegenetic marriage is not a recent innovation in this state nor is such a law by any means unique among the states. A short history of miscegenetic marriage laws in this state and elsewhere will contribute to a better understanding of the problem at hand. A law declaring marriages between white persons and Negroes to be illegal and void was enacted at the first session of our Legislature. (Stats. 1850, ch. 140, p. 424.) Section 60 of the Civil Code declaring certain marriages invalid has existed since the advent of our codes in 1872, at which time it extended only to intermarriage between white persons and Negroes or mulattoes. It succeeded the prohibition against such marriages found in the abovementioned statutes of 1850. Section 60 was amended in 1905 to include marriages between white persons and Mongolians (Stats. 1905, p. 554). The provisions of the law here at-

tacked have remained unchallenged for nearly one hundred years and have been unchanged so far as the marriage of whites with Negroes is concerned. To indicate that the subject matter is not merely of ancient legislative consideration it should be noted that in 1933 the District Court of Appeal decided that sections 60 and 69 did not prohibit the marriage in this state of a white woman and a Filipino—a member of the Malay race (*Roldan* v. *Los Angeles County*, 129 Cal.App. 267 [18 P.2d 706]). That case was decided on January 27, 1933. Without delay the Legislature amended both sections to extend the prohibition to marriages also as between white persons and members of the Malay race. The amendatory measures passed both houses of the Legislature and were signed by the governor on April 20th of the same year (Stats. 1933, p. 561) thus rendering nugatory the decision in the Roldan case—which was the obvious purpose of the legislation. As above indicated the present concern with the legislation is only as it affects marriages between white persons and Negroes.

Twenty-nine states in addition to California have similar laws. (Rhodes, "Annullment of Marriage" (1945); Charles S. Manguin, Jr., "The Legal Status of the Negro" (1940).) Six of these states have regarded the matter to be of such importance that they have by constitutional enactments prohibited their legislatures from passing any law legalizing marriage between white persons and Negroes or mulattoes. Several states refuse to recognize such marriages even if performed where valid (see Charles S. Manguin, Jr., "The Legal Status of the Negro" (1940); *In re Takahashi's Estate*, 113 Mont. 490 [129 P.2d 217]), particularly if an attempt has been made by residents of a state to evade the law (*Eggers* v. *Olson*, 104 Okla. 297 [231 P. 483]; *State* v. *Kennedy*, 76 N.C. 251 [22 Am.Rep. 683]). The infrequency of such unions is perhaps the chief reason why prohibitive laws are not found in the remaining states. (Reuter, "Race Mixture" (1931), p. 39; Rhodes, "Annullment of Marriage" (1945), pp. 101, 102.)

The ban on mixed marriages in this country is traceable from the early colonial period. For example, Maryland forbade the practice of marriage unions between Negroes or Indians and white persons as early as 1663. Laws forbidding marriages between Negroes and whites were passed in Massachusetts in 1705, in Delaware in 1721, in Virginia in 1726,

and in North Carolina in 1741. In 1724, it was decreed in France that no Negro-white marriages were to take place in Louisiana. Most of the remaining states enacted similar legislation in the period between the formation of the United States and the Civil War.

Research has not disclosed a single case where a miscegenetic marriage law has been declared invalid. As stated in *Estate of Monks,* 48 Cal.App.2d 603, 612 [120 P.2d 167]: "Many states have statutes prohibiting such alliances, and we have had presented no instance of successful constitutional attacks upon them or any of them." Not only the state courts but the federal courts as well have uniformly sustained the validity of such laws. One of the most recent decisions upon the subject is that of the United States Circuit Court of Appeals for the 10th Circuit in the case of *Stevens* v. *United States,* 146 F.2d 120, 123, decided December 18, 1944. The court there said: "Section 12 [Title 43, Oklahoma St. 1941], making unlawful marriages between persons of African descent and persons of other races or descents is challenged on the ground that it violates the Fourteenth Amendment. Marriage is a consentient covenant. It is a contract in the sense that it is entered into by agreement of the parties. But it is more than a civil contract between them, subject to their will and pleasure in respect of effects, continuance, or dissolution. It is a domestic relation having to do with the morals and civilization of a people. It is an essential institution in every well organized society. It affects in a vital manner public welfare, and its control and regulation is a matter of domestic concern within each state. A state has power to prescribe by law the age at which persons may enter into marriage, the procedure essential to constitute a valid marriage, the duties and obligations which it creates, and its effect upon the property rights of both parties. *Maynard* v. *Hill,* 125 U.S. 190 [8 S.Ct. 723, 31 L.Ed. 654]. And within the range of permissible adoption of policies deemed to be promotive of the welfare of society as well as the individual members thereof, a state is empowered to forbid marriages between persons of African descent and persons of other races or descents. Such a statute does not contravene the Fourteenth Amendment."

In *Pace* v. *Alabama,* 106 U.S. 583 [1 S.Ct. 637, 27 L.Ed. 207], the United States Supreme Court had before it a statute of the State of Alabama declaring that "if any white person and any negro . . . intermarry or live in adultery or

fornication with each other, each of them must, on conviction, be imprisoned in the penitentiary or sentenced to hard labor for the county for not less than two nor more than seven years." A Negro man and white woman had been convicted in the courts of Alabama of fornication. Upon writ of error to the United States Supreme Court it was contended that the statute was in conflict with the equal protection of law clause of the United States Constitution because greater punishment was provided than by another law relating to the same offense committed by peoples of the same race. The Supreme Court of the United States in upholding the statute and affirming the judgment of conviction stated: "The defect in the argument of counsel consists in his assumption that any discrimination is made by the laws of Alabama in the punishment provided for the offense for which the plaintiff in error was indicted when committed by a person of the African race and when committed by a white person. The two sections of the code cited are entirely consistent. The one prescribes, generally, a punishment for an offense committed between persons of different sexes; the other prescribes a punishment for an offense which can only be committed where the two sexes are of different races. . . . Whatever discrimination is made in the punishment prescribed in the two sections is directed against the offense designated and not against the person of any particular color or race. The punishment of each offending person, whether white or black, is the same."

In *State* v. *Tutty*, 41 F. 753 [7 L.R.A. 50], where a statute was held not in deprivation of rights under the federal Constitution, it was said: "The court will not discuss the argument of defendants' counsel to the effect that the intermarriages of whites and blacks do not constitute an evil or an injury against which the state should protect itself. This is a question which has been, as we have seen, the subject of repeated judicial deliverances; but it is more properly, in the opinion of this court, within the range of legislative duty. It is enough, for the purpose of its duty, for the court to ascertain that by a legitimate and settled policy the state of Georgia has declared such marriages unlawful and void; for while, in this country, the home life of the people, their decency and their morality, are the bases of that vast social structure of liberty, and obedience to law, which excites the patriotic pride of our countrymen and the admiration of the

world, and while these attributes of our citizenship should be cherished and protected by all in authority, and the creatures who defy them should be condemned by all, the courts, in their judicial functions, are rarely concerned with the policy of the laws which are made to protect the community. The policy of the state upon this subject has been declared, as we have seen, by its supreme court as well as by its statutes, and it is enough to say that this court is unable to discover anything in that policy with which the federal courts have the right or the power to interfere.''

In *Scott* v. *State of Georgia*, 39 Ga. 321, the Supreme Court of Georgia said of a provision of the state Constitution prohibiting marriages between whites and Negroes, and declaring all such marriages void: ''With the policy of this law we have nothing to do. It is our duty to declare what the law is, not to make law. For myself, however, I do not hesitate to say that it was dictated by wise statesmanship, and has a broad and solid foundation in enlightened policy, sustained by sound reason and common sense. The amalgamation of the races is not only unnatural, but is always productive of deplorable results. . . . The power of the Legislature over the subject matter when the Code was adopted, will not, I suppose, be questioned. The Legislature certainly had as much right to regulate the marriage relation by prohibiting it between persons of different races as they had to prohibit it between persons within the Levitical degrees, or between idiots. Both are necessary and proper regulations. And the regulation now under consideration is equally so.''

In *State* v. *Jackson, supra* (80 Mo. 175), the Supreme Court of Missouri reversed a judgment sustaining a demurrer to an indictment charging a white woman with violation of a statute making marriages between white persons and Negroes a felony. The court said that the law might ''interfere with the tastes of negroes who want to marry whites, or whites who wish to intermarry with negroes, but the State has the same right to regulate marriage in this respect that it has to forbid the intermarriage of cousins and other blood relations. If the State desires to preserve the purity of the African blood by prohibiting intermarriage between whites and blacks, we know of no power on earth to prevent such legislation. It is a matter of purely domestic concern. The 14th amendment to the Constitution of the United States . . . has no such scope as seems to have been accorded it by the circuit court. . . . All of one's rights as a citizen of the United States

will be found guaranteed by the Constitution of the United States. If any provision of that instrument confers upon a citizen the right to marry any one who is willing to wed him, our attention has not been called to it. If such be one of the rights attached to American citizenship all our marriage acts forbidding intermarriage between persons within certain degrees of consanguinity are void . . . [T]he condition of a community, moral, mental and physical, which would tolerate indiscriminate intermarriage for several generations, would demonstrate the wisdom of laws which regulate marriage and forbid the intermarriage of those nearly related in blood."

The Supreme Court of Oklahoma, in *Eggers v. Olson, supra* (104 Okla. 297 [231 P. 483, 486]), said: "The inhibition, like the incestuous marriage, is in the blood, and the reason for it is stronger still." The court quoted from 18 R.C.L., section 31, p. 409, in part, as follows: " 'Civilized society has the power of self preservation, and, marriage being the foundation of such society, most of the states in which the negro forms an element of any note have enacted laws inhibiting intermarriage between the white and black races . . . Statutes forbidding intermarriage by the white and black races were without doubt dictated by wise statesmanship, and have a broad and solid foundation in enlightened policy, sustained by sound reason and common sense. The amalgamation of the races is not only unnatural, but is always productive of deplorable results. The purity of the public morals, the moral and physical development of both races, and the highest advancement of civilization, under which the two races must work out and accomplish their destiny, all require that they should be kept distinctly separate, and that connections and alliances so unnatural should be prohibited by positive law and subject to no evasion.' "

The miscegenation law of our neighboring state of Oregon (Ore. L., § 2163) was held valid by the Supreme Court of that state in *In re Paquet's Estate,* 101 Ore. 393 [200 P. 911]. In so holding the court directed attention to 8 R.C.L. section 381 where it is said: "Miscegenation is a purely statutory offense, consisting in the intermarriage of a person of the white race with a negro or colored person. Most states in which the negro or colored people form an appreciable element have enacted these laws inhibiting intermarrying between the white and black races, and the offense thereby created is usually of the grade of a felony. There can be no doubt as

to the power of every country to make laws regulating the marriage of its own subjects; to declare who may marry, how they may marry, and what shall be the legal consequences of their marrying; and accordingly, although miscegenation statutes have been persistently attacked on the ground that they are violative of the United States Constitution, they have been universally upheld as a proper exercise of the power of each state to control its own citizens." (See also 36 Am.Jur., Miscegenation, § 3.)

The foregoing views are representative of the general tenor of judicial opinion which has been expressed elsewhere. Without further amplification reference may be made to cases in Arizona (*State* v. *Pass* (1942), 59 Ariz. 16 [121 P.2d 882] ; *Kirby* v. *Kirby* (1922), 24 Ariz. 9 [206 P. 405]), in Colorado (*Jackson* v. *City and County of Denver* (1942), 109 Colo. 196 [124 P.2d 240]), in Montana (*In re Takahashi's Estate, supra,* (1942), 113 Mont. 490 [129 P.2d 217] —Japanese-White), in Alabama (*Green* v. *State* (1877), 58 Ala. 190 [29 Am.Rep. 739]), in Virginia (*Kinney* v. *The Commonwealth, supra* (1878), 30 Gratt. 858 [32 Am.Rep. 690]), in Indiana (*State* v. *Gibson* (1871), 36 Ind. 389 [10 Am.Rep. 42]), in Arkansas (*Dodson* v. *State* (1895), 61 Ark. 57 [31 S.W. 977]), in Texas (*Frasher* v. *State* (1877), 3 Tex.App. 263 [30 Am.Rep. 131]), in Tennessee (*Lonas* v. *State* (1871), 50 Tenn. (3 Heisk.) 287), in Pennsylvania (*Philadelphia & West Chester R. R. Co.* v. *Miles,* 2 Am.Law Rev. 358).

The foregoing authorities form an unbroken line of judicial support, both state and federal, for the validity of our own legislation, and there is none to the contrary. Those authorities appear to have passed upon all attacks on such legislation on constitutional grounds, but notwithstanding their unanimity it is declared by some of the majority that there is a sort of racial discrimination which solely formed the basis for the enactments and by another of the majority that the constitutional guarantee of freedom of religion has been infringed. However, it is the law that if there is some factual background for the legislation, that circumstance forms an appropriate reason for the enactments, and it is then proper to consider the rules of law which govern the courts in that connection.

In passing upon the validity of any statutory enactment the power of the courts is not unlimited. It is circumscribed by well recognized rules, some of which as applicable to the

case are: that all presumptions and intendments are in favor of the constitutionality of a statute; that all doubts are to be resolved in favor of and not against the validity of a statute; that before an act of a coordinate branch of our government can be declared invalid by the courts for the reason that it is in conflict with the Constitution, such conflict must be clear, positive and unquestionable; that in the case of any fair, reasonable doubt of its constitutionality the statute should be upheld, and the doubt be resolved in favor of the expressed will of the Legislature; that it is also to be presumed that the Legislature acted with integrity and with a purpose to keep within the restrictions and limitations laid down in the fundamental law; that when the constitutionality of a statute depends on the existence of some fact or state of facts, the determination thereof is primarily for the Legislature and the courts will acquiesce therein unless the contrary clearly appears; that the enactment of the statute implies, and the conclusive presumption is, that the Governor and the members of the Legislature have performed their duty, and have ascertained the existence of facts justifying or requiring the legislation; that this is true even in the absence of an express finding of those facts embodied in the act; and that the courts may not question or review the legislative determination of the facts. (5 Cal.Jur., p. 628 et seq., and the many cases there cited.) These presumptions apply with particular emphasis to statutes passed in the exercise of the police power (11 Am.Jur., p. 1088, and many cases cited).

A recent statement by this court recognizes the general rule. In *In re Porterfield,* 28 Cal.2d 91, 103 [168 P.2d 706, 167 A.L.R. 675], with supporting authorities, it is said: "Constitutionality of purpose and application is generally to be presumed. It has often been said that it is only when it clearly appears that an ordinance or statute passes definitely beyond the limits which bound the police power and infringes upon rights secured by the fundamental law, that it should be declared void."

Pertinent to the immediate question is *Galeener* v. *Honeycutt,* 173 Cal. 100, 104 [159 P. 595]. This court there approved the doctrine announced in earlier cases. It was said that it had never since been questioned that, when the right to enact a law depends upon the existence of a fact, the passage of the act implies, and the conclusive presumption is, that the

existence of the fact has been ascertained by the legislative body. (See also *In re Spencer,* 149 Cal. 396, 400 [86 P. 896, 117 Am.St.Rep. 137, 9 Ann.Cas. 1105] ; *Martin* v. *Superior Court,* 194 Cal. 93, 101 [227 P. 762] ; *Pacific Gas & Elec. Co.* v. *Moore,* 37 Cal.App.2d 91, 95 [98 P.2d 819].)

It is not within the province of the courts to go behind the findings of the Legislature and determine that conditions did not exist which gave rise to and justified the enactment. Only when, beyond reasonable doubt, all rational men would agree that the factual background did not warrant the enactment of a statute which was ostensibly designed to preserve the general welfare can we say that a statute is arbitrary and capricious. (*In re Miller,* 162 Cal. 687 [124 P. 427] ; *People* v. *George,* 42 Cal.App.2d 568 [109 P.2d 404].) It is a well settled rule of constitutional exposition, that if a statute may or may not be, according to the circumstances, within the limits of legislative authority, the existence of the circumstances necessary to support it must be presumed. (*Sweet* v. *Rechel,* 159 U.S. 380, 393 [16 S.Ct. 43, 40 L.Ed. 188].) When a question of fact is debated and debatable, and the extent to which a special constitutional limitation should be applied is under consideration, the conclusion may properly be influenced by a widespread and long continued belief concerning it, and this is within judicial cognizance. (*Muller* v. *Oregon,* 208 U.S. 412, 421 [28 S.Ct. 324, 52 L.Ed. 551].)

The Legislature is, in the first instance, the judge of what is necessary for the public welfare. Earnest conflict of opinion makes it especially a question for the Legislature and not for the courts. (*Erie R. R. Co.* v. *Williams,* 233 U.S. 685, 699, 701 [34 S.Ct. 761, 58 L.Ed. 1155], citing other cases.) ''It is established that a distinction in legislation is not arbitrary, if any state of facts reasonably can be conceived that would sustain it, and the existence of that state of facts at the time the law was enacted must be assumed. . . . It makes no difference that the facts may be disputed or their effect opposed by argument and opinion of serious strength. It is not within the competency of the courts to arbitrate in such contrariety. . . . And it is not required that we . . . be convinced of the wisdom of the legislation.'' (*Rast* v. *Van Deman & Lewis Co.,* 240 U.S. 342, 357, 365-366 [36 S.Ct. 370, 60 L.Ed. 679], citing cases.) ''We need not labor the point, long settled, that where legislative action is within the scope of the police power, fairly debatable questions as to its reasonableness, wisdom and propriety are not for the determination of the courts, but

for that of the legislative body on which rests the duty and responsibility of decision. . . . We may not test in the balances of judicial review the weight and sufficiency of the facts to sustain the conclusion of the legislative body . . ." (*Standard Oil Co.* v. *Marysville,* 279 U.S. 582, 584, 586 [49 S.Ct. 430, 73 L.Ed. 856], and cited cases.) Underlying questions of fact which may condition the constitutionality of legislation carry with them the presumption of constitutionality in the absence of some factual foundation *of record* for overthrowing the statute. (*O'Gorman & Young* v. *Hartford F. Ins. Co.,* 282 U.S. 251, 257-258 [51 S.Ct. 130, 75 L.Ed. 324].)

Again the United States Supreme Court has reiterated in *Borden's F. P. Co.* v. *Baldwin,* 293 U.S. 194, at page 209 [55 S.Ct. 187, 79 L.Ed. 281] : "When the classification made by the legislature is called in question, if any state of facts reasonably can be conceived that would sustain it, there is a presumption of the existence of that state of facts, and one who assails the classification must carry the burden of showing by a resort to common knowledge or other matters which may be judicially noticed, or to other legitimate proof, that the action is arbitrary. . . . The principle that the State has a broad discretion in classification, in the exercise of its power of regulation, is constantly recognized by this Court." (*People* v. *Western Fruit Growers,* 22 Cal.2d 494, 506-508 [140 P.2d 13] ; *Western U. Tel. Co.* v. *Hopkins,* 160 Cal. 106, 122 [116 P. 557] ; *Postal Tel. Cable Co.* v. *County of Los Angeles,* 160 Cal. 129 [116 P. 566].) Whether the legislation is wise or unwise as a matter of policy is a question with which the courts are not concerned. (*Home Bldg. & L. Assn.* v. *Blaisdell,* 290 U.S. 398, 447-448 [54 S.Ct. 231, 78 L.Ed. 413, 88 A.L.R. 1481].)

Courts are neither peculiarly qualified nor organized to determine the underlying questions of fact with reference to which the validity of the legislation must be determined. Differing ideas of public policy do not properly concern them. The courts have no power to determine the merits of conflicting theories, to conduct an investigation of facts bearing upon questions of public policy or expediency, or to sustain or frustrate the legislation according to whether they happen to approve or disapprove the legislative determination of such questions of fact. (*Norman* v. *Baltimore & O. R. Co.,* 294 U.S. 240 [55 S.Ct. 407, 79 L.Ed. 885, 95 A.L.R. 1352], affirming 265 N.Y. 37 [191 N.E. 726, 92 A.L.R. 1523] ; 11 Am.Jur. pp. 823, 824, and cases cited; see article, "*Judicial*

*Determination of Questions of Fact Affecting the Constitutional Validity of Legislative Action,"* 38 Harv.L.Rev. 6.) The fact that the finding of the Legislature is in favor of the truth of one side of a matter as to which there is still room for difference of opinion is not material. What the people's legislative representatives believe to be for the public good must be accepted as tending to promote the public welfare. It has been said that any other basis would conflict with the spirit of the Constitution and would sanction measures opposed to a republican form of government. (*Atlantic Coast Line R. Co.* v. *Georgia,* 234 U.S. 280 [34 S.Ct. 829, 58 L.Ed. 1312] ; *Viemeister* v. *White,* 179 N.Y. 235 [72 N.E. 97, 103 Am. St.Rep. 859, 1 Ann.Cas. 334, 70 L.R.A. 796] ; *State ex rel. Sullivan* v. *Dammann,* 227 Wis. 72 [277 N.W. 687] ; *Stettler* v. *O'Hara,* 69 Ore. 519 [139 P. 743, Ann.Cas. 1916A 217, L.R.A. 1917C 944], affirmed 243 U.S. 629 [37 S.Ct. 475, 61 L.Ed. 937].)

Text and authorities which constitute the factual basis for the legislative finding involved in the statute here in question indicate only that there is a difference of opinion as to the wisdom of the policy underlying the enactments.

Some of the factual considerations which the Legislature could have taken into consideration are disclosed by an examination of the sources of information on the biological and sociological phases of the problem and which may be said to form a background for the legislation and support the reasoning found in the decisions of the courts upholding similar statutes. A reference to a few of those sources of information will suffice.

On the biological phase there is authority for the conclusion that the crossing of the primary races leads gradually to retrogression and to eventual extinction of the resultant type unless it is fortified by reunion with the parent stock. (W. A. Dixon, M. D., Journal of American Medical Association, vol. 20, p. 1 (1893) ; Frederick L. Hoffman, statistician, Prudential Life Insurance Co. of America, American Economics Association, vol. 11 (1896) "Race Traits and Tendencies of the American Negro"; C. E. Woodruff, "The Expansion of Races" (1909).) In September. 1927, in an article entitled, "Race Mixture," which appeared in "Science," volume 66, page X, Dr. Charles B. Davenport of the Carnegie Foundation of Washington, Department of Experimental Evolution, said: "In the absence of any uniform rule as to consequences of race crosses, it is well to discourage it except in those cases where, as

in the Hawaiian-Chinese crosses, it clearly produces superior progeny," and that the Negro-white and Filipino-European crosses do not seem to fall within the exception.

In volume 19 of the Encyclopedia Americana (1924), page 275, it is said: "The results of racial intermarriage have been exceedingly variable. Sometimes it has produced a better race. This is the case when the crossing has been between different but closely allied stocks. . . . Prof. U. G. Weatherly writes: 'It is an unquestionable fact that the yellow, as well as the negroid peoples possess many desirable qualities in which the whites are deficient. From this it has been argued that it would be advantageous if all races were blended into a universal type embodying the excellencies of each. But scientific breeders have long ago demonstrated that the most desirable results are secured by specializing types rather than by merging them.

" 'The color line is evidence of an attempt, based on instinctive choice, to preserve those distinctive values which a racial group has come to regard as of the highest moment to itself.' "

In an address before the Commonwealth Club of California on July 9, 1948, Mr. William Gemmill, South African delegate to the International Labor Organization and one well acquainted with social conditions and sociological manifestations in that continent, made the statement that in South Africa, where the European population is greatly outnumbered by the natives, both classes are adamant in opposition to intermarriage and that the free mixing of all the races could in fact only lower the general level.

A collection of data and references on the result of miscegenation is found in "The Menace of Color" (1925) by J. W. Gregory (F.R.S., D.Sc., Professor of Geology in the University of Glasgow). On page 227 he says that the intermixtures which have been beneficial to the progress of mankind have been between nearly related peoples and that the results of a mixture of widely divergent stock serve to warn against the miscegenation of distinct races. Dr. J. A. Mjoen of the Winderen Laboratory, Norway, is credited by Professor Gregory (at p. 229) with the conclusion from special studies that the evidence is sufficient to call for immediate action against the intermarriage of widely distinct races. Gregory states that where two such races are in contact the inferior qualities are not bred out, but may be emphasized in the progeny, a principle widely expressed in modern eugenic literature. Similar views asserting

the unfortunate results of crossings between dissimilar races, including the American Negro-white, are ascribed by the author to Prof. H. Lundborg (1922); E. D. Cope, American geologist; Elwang (1904); Prof. N. S. Shaler (1904); Emile Gaboriau and Gustav Le Bon, France; F. L. Hoffman of the Prudential Insurance Co. of America (1923); Prof. A. E. Jenks; and Herbert Spencer (1892).

In March, 1926, the Carnegie Institution of Washington, D. C., accepted a gift from one who expressed his interest in the problem of race crossing with special reference to its significance for the future of any country containing a mixed population. The work was undertaken by the Department of Genetics, Carnegie Institution. An advisory committee was organized consisting of W. V. Bingham, Charles B. Davenport, E. L. Thorndike, and Clark Wissler. Mr. Morris Steggerda was selected as field investigator. Mr. Steggerda had had excellent training in genetics and psychology, and had shown a marked fitness for the study and analysis of the individual. The main project was carried out in Jamaica, B.W.I., by studying in detail and comparatively, 100 each of adults of full-blooded Negroes (Blacks), Europeans (Whites), and White-Black mixtures of all degrees (Brown). Half of the hundred were of each sex. In addition to the main project some 1,200 children of school and preschool age were observed and measured. Finally in 1929, an extensive report was published by the Carnegie Institution, in book form entitled "Race Crossing in Jamaica," by B. C. Davenport and Morris Steggerda, in collaboration with others. The results of their investigation indicated that the crossing of distinct races is biologically undesirable and should be discouraged.

W. E. Castle, Bussey Institution, Harvard University, in an article entitled "Biological and Social Consequences of Race Crossing," printed in volume 9, American Journal of Physical Anthropology (April, 1926), states on page 152: "If all inheritance of human traits were simple Mendelian inheritance, and natural selections were unlimited in its action among human populations, then unrestricted racial intercrossing might be recommended. But in the light of our present knowledge, few would recommend it. For, in the first place, much that is best in human existence is a matter of social inheritance, not of biological inheritance. Race crossings disturb social inheritance. That is one of its worst features." This then leads to a consideration of the sociological phase.

The writings of Father John La Farge, S. J., are typical of many who have considered the subject of race-crosses from a sociological standpoint. Reference has been made to his work "The Race Question and the Negro" (1943). Under the heading "The Moral Aspect," he writes: "[T]here are *grave reasons* against any general practice of intermarriage between the members of different racial groups. These reasons, where clearly verified, amount to a moral prohibition of such a practice.

"These arise from the great difference of condition which is usually experienced by the members of the respective groups. It is not merely a difference of poverty or riches, of lesser or greater political power, but the fact that identification with the given group is far-reaching and affects innumerable aspects of ordinary daily life. . . .

"Where marriage is contracted by entire solitaries, such an interracial tension is more easily borne, but few persons matrimonially inclined are solitaries. They bring with them into the orbit of married life their parents and brothers and sisters and uncles and aunts and the entire social circle in which they revolve. All of these are affected by the social tension, which in turn reacts upon the peace and unity of the marriage bond.

"When children enter the scene the difficulty is further complicated unless a complete and entirely self-sacrificing understanding has been reached beforehand. And even then the social effects may be beyond their control. . . .

"In point of facts as the Negro group becomes culturally advanced, there appears no corresponding tendency to seek intermarriage with other races."

The foregoing excerpts from scientific articles and legal authorities make it clear that there is not only some but a great deal of evidence to support the legislative determination (last made by our Legislature in 1933) that intermarriage between Negroes and white persons is incompatible with the general welfare and therefore a proper subject for regulation under the police power. There may be some who maintain that there does not exist adequate data on a sufficiently large scale to enable a decision to be made as to the effects of the original admixture of white and Negro blood. However, legislators are not required to wait upon the completion of scientific research to determine whether the underlying facts carry sufficient weight to more fully sustain the regulation.

A review of the subject indicates that the statutory classification was determined by the Legislature in the light of all the circumstances and requirements (see also *California Physicians' Service* v. *Garrison,* 28 Cal.2d 790, 802 [172 P.2d 4, 167 A.L.R. 306]; *Livingston* v. *Robinson,* 10 Cal.2d 730 [76 P.2d 1192]); that under our tripartite system of government this court may not substitute its judgment for that of the Legislature as to the necessity for the enactment where it was, as here, based upon existing conditions and scientific data and belief; that even in the field of fundamental rights it has always been recognized that where the Legislature has appraised a particular situation and found a specific condition sufficiently important to justify regulation, such determination is given great weight when the law is challenged on constitutional grounds.

Those favoring present day amalgamation of these distinct races irrespective of scientific data of a cautionary nature based upon the experience of others, or who feel that a supposed infrequency of interracial unions will minimize undesirable consequences to the point that would justify lifting the prohibition upon such unions, should direct their efforts to the Legislature in order to effect the change in state policy which they espouse—as was done in Massachusetts in 1843, Kansas in 1859, New Mexico in 1866, Washington in 1868, Rhode Island in 1881, Minnesota and Michigan in 1883, and Ohio in 1887.

The contention is also advanced that the statute must fall before the equal protection clause of the Fourteenth Amendment because of lack of a sufficient showing of clear and present danger arising out of an emergency. The cases relied upon are *Oyama* v. *California,* 332 U.S. 633 [68 S.Ct. 269, 92 L.Ed. ——]; *Sipuel* v. *Board of Regents,* 332 U.S. 631 [68 S.Ct. 299, 92 L.Ed. ——]; *Railway Mail Assn.* v. *Corsi,* 326 U.S. 88 [65 S.Ct. 1483, 89 L.Ed. 2072]; *Hirabayashi* v. *United States,* 320 U.S. 81 [63 S.Ct. 1375, 87 L.Ed. 1774]; *Missouri ex rel. Gaines* v. *Canada, supra,* 305 U.S. 337; *Williams* v. *International etc. of Boilermakers,* 27 Cal.2d 586 [165 P.2d 903]; and *James* v. *Marinship Corp.,* 25 Cal.2d 721 [155 P.2d 329, 160 A.L.R. 900] (see also *Shelley* v. *Kraemer* and *McGhee* v. *Sipes,* 334 U.S. 1 [68 S.Ct. 836, 92 L.Ed. ——]; *Hurd* v. *Hodge,* 334 U.S. 24 [68 S.Ct. 847, 92 L.Ed. ——]). These cases, in general, hold that legislation discriminating against particular persons, or groups of persons because of race, must have exceptional circumstances or some

compelling necessity as the source of enactment. These cases have been analyzed. They have widely divergent factual backgrounds and are not controlling. Here there is no lack of equal treatment. Sections 60 and 69 of our Civil Code do not discriminate against persons of either the white or Negro races. (*Pace* v. *Alabama, supra,* 106 U.S. 583; *Jackson* v. *City and County of Denver, supra,* 109 Colo. 196 [124 P.2d 240]; *In re Paquet's Estate, supra,* 101 Ore. 393 [200 P. 911].) Each petitioner has the right and the privilege of marrying within his or her own group. The regulation does not rest solely upon a difference in race. The question is not merely one of difference, nor of superiority or inferiority, but of consequence and result. The underlying factors that constitute justification for laws against miscegenation closely parallel those which sustain the validity of prohibitions against incest and incestuous marriages (Pen. Code, § 285; Civ. Code, § 59; 42 C.J.S., Incest, § 1), and bigamy (Pen. Code, § 281; Civ. Code, § 61; *Davis* v. *Beason, supra,* 133 U.S. 333; *Reynolds* v. *United States, supra,* 98 U.S. 145). Moreover the argument based upon equal protection does not take into proper account the extensive control the state has always exercised over the marriage contract, nor of the further fact that at the very time the Constitution of the United States was being formulated miscegenation was considered inimical to the public good and was frowned upon by the colonies, and continued to be so regarded and prohibited in states having any substantial admixture of population at the time the Fourteenth Amendment was adopted. In view of this fact, and the unanimity of judicial decision sustaining such statutes, it seems impossible to believe that any constitutional guaranty was intended to prohibit this legislation.

It has been suggested that sections 60 and 69 of the Civil Code are unconstitutional because not sufficiently comprehensive. More specifically it is said that such legislation does not preclude the possibility of progeny as a result of purported marriages entered into by persons who have concealed or failed to disclose their racial origin, nor the possibility of illegitimate progeny of mixed matings or of issue from such racially mixed marriages validly contracted in other states by residents of this state. However it is definitely established that the states, in seeking a remedy, are not required to extend regulation to all cases which might possibly be reached. (*Radice* v. *New York, supra,* 264 U.S. 292.) "They

may mark and set apart the classes and types of problems according to the needs and as dictated or suggested by experience." (*Skinner* v. *Oklahoma,* 316 U.S. 535, 540 [62 S.Ct. 1110, 86 L.Ed. 1655]; *Bryant* v. *Zimmerman,* 278 U.S. 63 [49 S.Ct. 61, 73 L.Ed. 184].) The equal protection clause does not prevent the Legislature from recognizing "degrees of evil." (*Tigner* v. *Texas,* 310 U.S. 141 [60 S.Ct. 879, 84 L.Ed. 1124]; *Truax* v. *Raich,* 239 U.S. 33 [36 S.Ct. 7, 60 L.Ed. 131].) Nor is the Legislature prevented by the equal protection clause from confining "its restrictions to those classes of cases where the need is deemed to be clearest." (*Miller* v. *Wilson,* 236 U.S. 373, 384 [35 S.Ct. 342, 59 L.Ed. 628].) "[W]here a given situation admittedly presents a proper field for the exercise of the police power the extent of its invocation and application is a matter which lies very largely in legislative discretion." (*Zahn* v. *Board of Public Works,* 195 Cal. 497, 514 [234 P. 388].) The need for prohibiting all miscegeny, together with administrative impracticalities inherent in any such attempt, were proper matters for the Legislature to consider. And the fact, if it be a fact, that some people contract such marriages within this state illegally, or others contract such marriages validly outside the state and subsequently reside here, does not lend support to any contention of unconstitutionality of the statute.

Finally, it is argued that sections 60 and 69 are too vague and uncertain to constitute valid regulation in that they lack definitions of descriptive terms, such as mulatto, and are uncertain as to the mode of proof of race. After almost 100 years of continuous operation of the present and preexisting similar laws, the claimed obstacles to the application of the statute are more theoretical than real. In any event the contention is not a matter for consideration in this proceeding. In the application for a marriage license the petitioner Perez states that she is a white person and the petitioner Davis states that he is a Negro. The petition for the writ contains allegations of the same facts. There is therefore no indefiniteness in the code sections that can avail the petitioners; nor is there here any problem of proof. It is the well-established rule that a charge of unconstitutionality can be raised only in a case where that issue is involved in the determination of the action, and then only by the person or a member of the class of persons adversely affected. (*American Fruit Growers* v. *Parker,* 22 Cal.2d 513 [140 P.2d 23]; *In re Willing,* 12 Cal.2d 591, 597 [86 P.2d 663]; *Max*

*Factor & Co.* v. *Kunsman,* 5 Cal.2d 446 [55 P.2d 177] ; *People* v. *Globe Grain & Mill. Co.,* 211 Cal. 121 [294 P. 3] ; *A. F. Estabrook Co.* v. *Industrial Acc. Com.,* 177 Cal. 767 [177 P. 848] ; *Estate of Monks, supra,* 48 Cal.App.2d 603, 610-612, involving the miscegenation law of Arizona—see also *Kirby* v. *Kirby, supra,* 24 Ariz. 9 [206 P. 405] ; and *State* v. *Pass, supra,* 59 Ariz. 16 [121 P.2d 882]—*Jackson* v. *City and County of Denver, supra,* 109 Colo. 196 [124 P.2d 240], involving a miscegenation statute of that state.) Here there is no possible uncertainty in the statute as applied to the petitioners.

The alternative writ should be discharged and the peremptory writ denied.

Schauer, J., and Spence, J., concurred.

Respondent's petition for a rehearing was denied October 28, 1948. Shenk, J., Schauer, J., and Spence, J., voted for a rehearing.